1  STRADLING YOCCA CARLSON & RAUTH, P.C.
   Fred Neufeld (SBN 150759)
2  Marianne Mortimer (SBN 296193)
   Tatiana Ingman (SBN 314284)
3  100 Wilshire Boulevard, 4th Floor
   Santa Monica, CA 90401
4  Telephone: (424) 214-7000
   Facsimile:  (424) 214-7010
5  E-mail: fneufeld@sycr.com
            mmortimer@sycr.com
6           tingman@sycr.com

7  Attorneys for KP3 Endeavors, Inc.

8

9                    UNITED STATES BANKRUPTCY COURT

10                  SOUTHERN DISTRICT OF CALIFORNIA

11

12

13  In re:                          Case No. 18-00007-MM7

14                                  Assigned to: Judge Margaret M. Mann

15  KP3 ENDEAVORS, INC.,            Involuntary Chapter 7

16          Alleged Debtor.
                                    **KP3 ENDEAVORS, INC.'S BRIEF**
17                                  **IN SUPPORT OF DISMISSAL OF**
                                    **THE INVOLUNTARY CHAPTER 7**
18                                  **PETITION**

19                                  **PUBLIC REDACTED VERSION**

20                                  Pre-Trial Hearing:
21                                  Date:      April 6, 2018
                                    Time:      2:00 P.M.
22                                  Location:  Courtroom 218
                                               U.S. Bankruptcy Court
23                                               325 W F St.
                                               San Diego CA 92101
24

25

26

27

28

DOCSSM/3048660v16/105045-0003

# TABLE OF CONTENTS

Page(s)

I.   Introduction ...................................................................................... 1

II.  Jurisdiction ...................................................................................... 2

III. Background ...................................................................................... 3

A.   Procedural Background......................................................... 3

B.   KP3's Formation And Early Success....................................... 3

C.   Petitioning Creditors' Bad Acts And The State Court Action.......... 5

    i.   Erik and Ryan Secretly Used KP3's Own Employees To Provide Services To Their Competing Company. ............. 6

    ii.  Erik and Ryan Gave False Testimony Regarding Their Use Of KP3 Employees. ................................ 10

    iii. Erik And Ryan's Use Of KP3's Trade Secrets And Proprietary Information. ................................. 11

    iv.  Erik And Ryan Stopped Giving Their Full Time And Efforts To KP3, And Deferred Buying Opportunities For Their New Company. ........................ 12

    v.   Tom Pancheri Aided Erik And Ryan In Their Bad Acts....... 14

D.   The Involuntary Petition Was Orchestrated By Erik, Ryan And Tom Pancheri. ......................................... 15

IV.  Petitioning Creditors Cannot Possibly Meet Their Burden To Show That KP3 Is A Company That Was Generally Not Paying Its Debts As They Came Due........................... 16

A.   Petitioning Creditors Have Already Failed Their Evidentiary Burden ......................................... 17

B.   KP3 Is Generally Paying Its Debts As They Come Due Under The Totality Of The Circumstances Test................... 20

    i.   Legal Standard For Totality Of The Circumstances Test...... 20

    ii.  By Number, Amount And Materiality, KP3's Alleged Delinquencies Are Far from General ..................... 23

    iii. KP3's Exceptional Payment History ..................... 26

    iv.  As Petitioning Creditors Well Know, KP3 Is a Thriving Company................................ 27

C.   Petitioning Creditors Cannot Satisfy Their Burden Under 303(h).. 28

|  |  |  | i. | Petitioning Creditors' "Large Debts" Argument | 28 |
|  |  |  | ii. | Petitioning Creditors' Comparison Of Debt To One Month's Operating Costs | 30 |
|  |  |  | iii. | Petitioning Creditors' "Bad Faith" Argument | 34 |
| V. | | Petitioning Creditors Commenced This Case In Bad Faith | | | 37 |
|  | A. | Legal Standard: Dismissal For Bad Faith | | | 37 |
|  | B. | There Is Overwhelming Evidence Of Petitioning Creditors' Bad Faith | | | 38 |
|  |  |  | i. | The Filing Was A Substitute For A Debt Collection Action | 38 |
|  |  |  | ii. | The Petitioning Creditors Used The Filing To Obtain A Disproportionate Advantage For Themselves | 40 |
|  |  |  | iii. | The Petitioners Did Not Conduct A Reasonable Pre-Filing Inquiry | 41 |
|  |  |  | iv. | The Filing Was An Attempt To Gain A Tactical Advantage In The State Court Action. | 42 |
|  |  |  | v. | The Filing Was Motivated By Ill Will Towards KP3. | 44 |
|  |  |  | vi. | The Filing Had Suspicious Timing | 45 |
|  |  |  | vii. | Petitioning Creditors Had No Evidence of Preferential Payments or Dissipation of KP3's Assets. | 45 |
|  |  |  | viii. | Petitioning Creditors Did Not Satisfy—And Knowingly Disregarded—The Statutory Criteria For Filing The Petition. | 46 |
|  | C. | The Petition Has Damaged KP3. | | | 48 |
| VI. | | petitioning Creditors Cannot Meet Their Burden To Show That Their Claims Are Not In Bona Fide Dispute As To Liability And Amount | | | 49 |
|  | A. | SDCC's Claims Are Subject To Bona Fide Dispute As To Liability And Amount. | | | 52 |
|  | B. | The Claims Of REPS And BLPT Are Part Of A Single Transaction To Form KP3, And Petitioners' Bad Acts Place These Claims In Dispute. | | | 54 |
|  |  |  | i. | KP3's Unclean Hands Defenses | 56 |
|  |  |  | ii. | KP3's Material Breach Defense | 58 |
|  |  |  | iii. | KP3's Implied Covenant Of Good Faith And Fair Dealing Defense | 58 |

C.    BLPT's Claim Is Subject To Bona Fide Dispute..............................59

    i.    BLPT Has Not Established A Prima Facie Right To Payment Under The Note, Including As To Whether It Is A Holder Of The Note. ..........................................................60

    ii.    Even if BLPT Is A Holder, There Is A Genuine Dispute Of Material Fact That It Is A Holder In Due Course..................63

    iii.    BLPT's Other Arguments Support The Conclusion That There Is A Bona Fide Dispute ...............................................65

D.    The REPS Line Of Credit Is Subject To Bona Fide Dispute...........65

    i.    REPS Cannot Meet Its Prima Facie Burden On The REPS LOC ...................................................................................65

    ii.    There Are Bona Fide Disputes Regarding KP3's Obligations Under The REPS LOC, Including As To The Maturity Date.......................................................................67

E.    The REPS Purchase Agreement Is Subject To Bona Fide Dispute. 70

    i.    The Purchase Agreement Must Be Enforced In Arbitration, And Is Not Properly Addressed In This Court ......................70

    ii.    Petitioning Creditors Admit That The Amount They Seek Under the REPS Purchase Agreement Is Disputed. ..............71

    iii.    The REPS Purchase Agreement Is An "Interested Transaction," And REPS Bears The Burden To Prove The Agreement Is Not "Void or Voidable" ..................................75

    iv.    KP3's Frustration of Purpose Defense To Enforcement Of The Purchase Agreement........................................................76

        a.    The Purpose Of The REPS Purchase Agreement Was For Erik And Ryan To Focus Their Efforts On KP3's Business.......................................................77

        b.    Erik And Ryan's Bad Acts Frustrated The Purpose Of The REPS Purchase Agreement............................79

VII.    Conclusion And Reservation Of Rights ....................................................80

VIII.    Log of Exhibits .........................................................................................80

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*In re A&J Quality Diamonds*, *Inc.*,
   377 B.R. 460 (Bankr. S.D.N.Y. 2007) ....................................................................17

*In re All Media Props., Inc.*,
   5 B.R. 126 (Bankr. S.D. Tex. 1980),
   *aff'd* 646 F.2d 193 (5th Cir. 1981) ...........................................21, 22, 24, 31, 34, 35

*Am. Shooting Ctr., Inc. v. Secfor Int'l*,
   2016 U.S. Dist. LEXIS 40523 (S.D. Cal. March 28, 2016)..............................7, 8

*In re Apollo Health St., Inc.*,
   No. 11-22970 (NLW), 2011 Bankr. LEXIS 1838 (Bankr. D.N.J. May 18,
   2011) ................................................................................21, 23, 26, 32, 33

*Ash v. Moldo (In re Thomas)*,
   No. CC-03-1052-PMaPa, 2006 Bankr. LEXIS 4855 (B.A.P. 9th Cir. July 25,
   2006) ................................................................................................21

*Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.*,
   986 F.2d 709 (4th Cir. 1993) .........................................................39, 41, 48

*In re B.D. International Corp.*,
   701 F.2d 1071 (2nd Cir. 1983).............................................................20, 35

*Basin Elec. Power Coop. v. Midwest Proc. Co.*,
   769 F.2d 483 (8th Cir. 1985) .................................................................47

*In re Better Care, Ltd.*,
   97 B.R. 405 (Bankr. N.D. Ill. 1989) ...............................................21, 22, 40

*In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*,
   779 F.2d 471 (9th Cir. 1985) .......................................20, 21, 23, 31, 32

*Boston Beverage Corp. v. Turner*,
   81 B.R. 738 (D. Mass. 1987) .................................................................22

*In re Bowers*,
   16 B.R. 298 (Bankr. D. Conn. 1981) .......................................................28

*In re Brooklyn Res. Recovery*,
   216 B.R. 470 (Bankr. E.D.N.Y. 1997)..................................................31, 35

*C & C Jewelry Mfg. v. Laxmi Jewel Inc. (In re C & C Jewelry Mfg.)*,
   373 F. App'x 775 (9th Cir. 2010) ...........................................................38

*In re C&C Dev. Grp., LLC*,
  NO. 11-32362-BKC-AJC, 2012 Bankr. LEXIS 2269 (Bankr. S.D. Fla. May
  21, 2012) ............................................................................................................56

*C&C Jewelry Mfg. v. Laxmi Jewel Inc. (In re C &C Jewelry Mfg.)*,
  No. 08-1238, 2009 Bankr. LEXIS 4516 (B.A.P. 9th Cir. April 10, 2009) ....................69, 73

*Concrete Pumping Serv., Inc. v. King Constr. Co.*,
  943 F.2d 627 (6th Cir. 1991) .......................................................................23, 35

*Crest One SpA v. TPG Troy, LLC (In re TPG Troy, LLC)*,
  793 F.3d 228 (2d Cir. 2015).................................................................................51

*In re Dami*,
  172 B.R. 6 (Bankr. E.D. Pa. 1994) ..................................................................42

*In re Dino's*,
  183 B.R. 779 (Bankr. S.D. Ohio 1995)...................................................1, 46, 47

*Duran v. Antonini (In re Antonini)*,
  Nos. 09-16850-AJC, 10-03792-AJC, 2012 Bankr. LEXIS 133 (Bankr. S.D.
  Fla. Jan. 10, 2012).............................................................................................41

*In re ELRS Loss Mitigation, LLC*,
  325 B.R. 604 (Bankr. N.D. Okla. 2005) ....................................21, 24, 32, 53, 73

*In re Elverson*,
  492 B.R. 831 (Bankr. E.D. Pa. 2013) ..............................................................66

*In re Euro-American Lodging Corp.*,
  357 B.R. 700 (Bankr. S.D.N.Y. 2007)................................................23, 29, 34

*In re Express Car & Truck Rental, Inc.*,
  440 B.R. 422 (Bankr. E.D. Pa. 2010) ..............................................................66

*Focus Media, Inc. v. NBC (In re Focus Media, Inc.)*,
  378 F.3d 916 (9th Cir. 2004) .............................................................22, 29, 34

*In re Food Gallery*,
  222 B.R. 480 (Bankr. W.D. Pa. 1998) ...............................................................21

*In re Forever Green Athletic Fields, Inc.*,
  804 F.3d 328 (3d Cir. 2015).............................................37, 38, 41, 42, 44

*In re Fountainhead Global Trust*,
  No. 604-69908, 2005 Bankr. LEXIS 1423 (Bankr. D. Oregon July 1, 2005) ...............68, 73

*In re Garland Coal & Mining Co.*,
  67 B.R. 514 (Bankr. W.D. Ark. 1986)........................................................28, 29

*In re Goldsmith,*
    30 B.R. 956 (Bankr. E.D.N.Y. 1983)..................................................23, 36, 37, 45

*In re Grossinger,*
    268 B.R. 386 (Bankr. S.D.N.Y. 2001)..........................................................40

*In re Guerra,*
    Case No. 13-51100, 2014 Bankr. LEXIS 580 (Bankr. N.D. Cal. Feb. 11, 2014)................53

*Higgins v. Vortex Fishing Sys. (In re Vortex Fishing Sys.),*
    379 F.3d 701 (9th Cir. 2004) ...............................................1, 21, 32, 34, 59

*In re Huggins,*
    380 B.R. 75 (Bankr. M.D. Fla. 2007) ......................................................29, 35

*In re Hujazi,*
    Case No. 13-30477, 2015 Bankr. Lexis 4560 (Bankr. N.D. Cal. November 30,
    2015) ..........................................................................................26

*Hujazi v. Recoverex Corp. (In re Hujazi),*
    2017 Bankr. LEXIS 1963 (B.A.P. 9th Cir. July 14, 2017) ............................20, 22

*In re Int'l Teldata Corp.,*
    12 B.R. 879 (Bankr. D. Nev. July 24, 1981) ......................................28, 29, 31

*Langley v. FDIC,*
    484 U.S. 86 (1987)............................................................................66

*Laxmi Jewel Inc. v. C&C Jewelry Mfg., Inc. (In re C&C Jewelry Mfg., Inc.),*
    Nos. CC-08-1190-HMoMk, CC-08-1267-HMoMk, 2009 Bankr. LEXIS 4517
    (B.A.P. 9th Cir. Apr. 14, 2009)..........................16, 17, 22, 23, 34, 50, 80

*In re Leek,*
    52 B.R. 311 (Bankr. M.D. Fl. 1985) ............................................................22

*Liberty Tool & Manufacturing v. Vortex Fishing Systems, Inc.*
    *(In re Vortex Fishing Systems, Inc.),*
    277 F.3d 1057 (9th Cir. 2001) ..................16, 17, 20, 27, 30, 31, 32, 36, 50, 51, 59

*In re Marciano,*
    446 B.R. 407 (Bankr. C.D. Cal 2010), *aff'd Marciano v. Fahs (In re
    Marciano)*, 459 B.R. 27 (B.A.P. 9th Cir. 2011) ...........................................51

*Marciano v. Fahs (In re Marciano),*
    459 B.R. 27 (BAP 9th Cir. 2011)............................................................22, 51

*In re Mi La Sul,*
    380 B.R. 546 (Bankr. C.D. Cal. 2007)..........................................................40

*In re Molen Drilling Co.*,
   68 B.R. 840 (Bankr. D. Mont. 1987) ...........................................................29, 41

*Mont. Dep't of Revenue v. Blixseth*,
   No. 2:13-1324-JAD, 2017 U.S. Dist. LEXIS 206513 (D. Nev. Dec. 15, 2017).51, 53, 69, 80

*Morabito v. JH, Inc. (In re Morabito)*,
   2016 Bankr. LEXIS 2207 ...............................................................22, 28, 35

*In re Moss*,
   249 B.R. 411 (Bankr. N.D. Tex. 2000)........................................................35

*In re Mt. Dairies, Inc.*,
   372 B.R. 623 (Bankr. S.D.N.Y. 2007)..........................................51, 70, 71, 74

*In re Nordbrock*,
   772 F.2d 397 (8th Cir. 1985) ...................................................................39

*In re O'Neil*,
   No. 04-09162-JM7, 2006 Bankr. LEXIS 4704 (Bankr. S.D. Cal. Dec. 19,
   2006) ................................................................................................50, 51

*In re Paper I Partners*,
   283 B.R. 661(Bankr. S.D.N.Y. 2002) ........................................................30

*In re Reed*,
   11 B.R. ...............................................................................................22

*In re Silverman*,
   230 B.R. 46 (Bankr. D.N.J. 1998) ............................................................42

*Simula, Inc. v. Autoliv, Inc.*,
   175 F.3d 716 (9th Cir. 1999) ...................................................................71

*In re St. Marie Dev. Corp. of Mont. Inc.*,
   334 B.R. 663 (Bankr. D. Mont. 2005) ...................................................21, 33

*In re Tichy Elec. Co.*,
   332 B.R. 364 (Bankr. N.D. Iowa 2005) ................................................39, 41

*In re Tikijian*,
   76 B.R. 304 (Bankr. S.D.N.Y. 1987).........................................................29

*In re TPG Troy, LLC*,
   492 B.R. 150 (Bankr. S.D.N.Y. 2013)........................................................65

*Veal v. Am. Home. Mortg. Servicing, Inc. (In re Veal)*,
   450 B.R. 897 (B.A.P 9th Cir. 2011)...........................................................61

*In re VitaminSpice*,
   472 B.R. 282 (Bankr. E.D. Pa. 2012) ....................................................................17

*In re Wavelength*,
   61 B.R. 614 (B.A.P. 9th Cir. 1986)................................................................44, 45

*In re Win-Sum Sports, Ing.*,
   14 B.R. 389 (Bankr. D. Conn. 1981) ..................................................................21

*In re WLB-RSK Venture*,
   296 B.R. 509 (Bankr. C.D. Cal. July 28, 2003)....................................38, 42, 44

*Wolkowitz v. Lerner* (*In re Imperial Credit Indus.*),
   No. SA CV 07-777CAS, 2008 U.S. Dist. LEXIS 71984 (C.D. Cal. Sep. 18,
   2008) ...................................................................................................................75

**State Cases**

*Brown v. Grimes*,
   192 Cal. App. 4th 265 (2011) .............................................................................58

*Consolidated World Investments, Inc., v. Lido Preferred Ltd.*
   9 Cal.App.4th 373 (1992) ...................................................................................58

*Dickson, Carlson & Campillo v. Pole*,
   83 Cal. App. 4th 436 (2000) ...............................................................................56

*Equity Bank v. Gonsalves*,
   44 Conn. Supp. 464, 691 A.2d 1143 (Conn. Sup. Ct. 1996) ...............................64

*Federal Leasing Consultants, Inc. v. Mitchell Lipsett Co.*,
   85 Cal. App. 3d Supp. 44 (1978) .......................................................................76

*Floystrup v. City of Berkeley Rent Stabilization Bd.*,
   219 Cal. App. 3d 1309 (1990) ............................................................................58

*Harm v. Frasher*,
   181 Cal. App. 2d 405 (1960) ..............................................................54, 55, 59

*Holguin v. Dish Network LLC*,
   229 Cal. App. 4th 1310 (2014) ...........................................................54, 55, 58

*Huong Que, Inc. v. Luu*,
   150 Cal. App. 4th 400 (2007) ...............................................................................7

*Jackson v. 2109 Brandywine*,
   180 Md. App. 535 (Md. Ct. Sp. Appls. 2008) ....................................................64

*Kendall-Jackson Winery, Ltd. v. Superior Court*,
   76 Cal. App. 4th 970 (1999) ...............................................................56, 57, 58

*Lambert v. Barker*,
   232 Va. 21, 348 S.E.2d 214, 3 Va. Law Rep. 462 (Va. 1986)...............................................64

*Madison-Hunnewell Bank v. Hurt*,
   903 S.W.2d 175 (Mo. App. 1995) ...............................................................................64

*Manufacturers & Traders Trust Co. v. Korngold*,
   162 Misc. 2d 669, 618 N.Y.S.2d 744 (N.Y. Sup. 1994)...............................................64

*Peterson Dev. Co. v. Torrey Pines Bank*,
   233 Cal.App.3d 103 (Cal 4th 1991)...............................................................................66

*Sammis v. Stafford*,
   48 Cal. App. 4th 1935 (1996) .......................................................................................76

*Santa Fe Braun v. Ins. Co. of N. Am.*,
   No. CGC-04-428686, 2012 Cal. Super. LEXIS 306 (Oct. 26, 2012) ...................................59

*St. Agnes Med. Ctr. v. Pacificare of Cal.*,
   31 Cal. 4th 1187 (2003) ...............................................................................................71

*Versaci v. Superior Court*,
   127 Cal.App.4th 805 (2005) .........................................................................................55

*Wri Golden State v. Liu*,
   2012 Cal. App. Unpub. ................................................................................................58


**Federal Statutes**

11 U.S.C. § 303...............................................................................1, 32, 35, 47, 57, 70

11 U.S.C. § 303(b) .......................................................................26, 48, 50, 68, 74

11 U.S.C. § 303(h) ........................................................................16, 17, 20, 35

Ii U.S.C. § 303(i)...............................................................................................80


**State Statutes**

Cal. Civ. Code § 1476...............................................................................................52

Cal. Civ. Code § 1531...............................................................................................68

Cal. Code Civ. Proc. § 1281.2 ...............................................................................71

Cal. Corp. Code § 310(a)(1)-(3) ...............................................................................75

California Corporations Code § 310 ........................................................................75

California Corporations Code § 310(a) ...................................................................75

California Corporations Code § 310(a)(iii) .............................................................76

Cal. U.C.C. 1-201 ...................................................................................................60

Cal. U.C.C. § 3301 ..................................................................................................63

Cal. U.C.C. § 3302 ..................................................................................................63

Cal. U.C.C. § 3306 ..................................................................................................63

**Other Authorities**

59 C.J.S. Mortgages § 453 (2007) ..........................................................................65

Restatement Second of Contracts § 272 ..................................................................80

REST. OF CONTRACTS, 2ND, § 265 .......................................................................76, 79

**TO THE HONORABLE MARGARET MANN, U.S. BANKRUPTCY JUDGE FOR THE SOUTHERN DISTRICT OF CALIFORNIA AND ALL PARTIES IN INTEREST:**

KP3 Endeavors, Inc. ("KP3" or the "Alleged Debtor") files this brief in support of dismissal of the above-captioned proceeding pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 1017(f) and the Court's orders entered March 27, 2018.

## I.    INTRODUCTION

This involuntary chapter 7 bankruptcy case was commenced by the involuntary petition (as amended, the "Petition") filed on January 2, 2018 (the "Petition Date"). The Petition was initiated by petitioning creditors Bonnie L. Pancheri Trust (the "BLPT") and REPS Investments, Inc. ("REPS" and, together with BLPT, the "Pancheri Creditors"), and was subsequently joined by JBH, Inc., dba San Diego Computer Consulting ("SDCC" and together with the Pancheri Creditors, the "Petitioning Creditors") against KP3 pursuant to section 303 of title 11 of the United States Code (the "Bankruptcy Code"). This proceeding epitomizes the dangers of involuntary proceedings, and the grave risks such proceedings present for both the parties and the judicial system. "The danger of involuntary bankruptcy cannot be overlooked by the courts." *In re Dino's*, 183 B.R. 779, 783 (Bankr. S.D. Ohio 1995). As the Ninth Circuit explains: "Filing an involuntary petition should be a measure of last resort because even if the petition is filed in good-faith, it can "chill the alleged debtor's credit and sources of supply," and "scare away his customers." *Higgins v. Vortex Fishing Sys. (In re Vortex Fishing Sys.),* 379 F.3d 701, 707 (9th Cir. 2004) (citing *In re SBA Factors of Miami, Inc.*, 13 B.R. 99, 101 (Bankr. S.D. Fla. 1981) ("An allegation of bankruptcy is a charge that ought not to be made lightly. . . . It leaves a permanent scar, even if promptly dismissed. It is also obvious that the use of the bankruptcy court as a routine collection device would quickly paralyze this court.")

KP3 respectfully submits that the Petition can and should be dismissed on the basis of the parties' trial briefs. The undisputed facts and law demonstrate that Petitioning Creditors cannot meet their burden of proof on any required element of Section 303, and have filed this Petition under circumstances that constitute bad faith. The following facts are beyond dispute:

- Petitioning Creditors are in an acrimonious legal dispute with KP3 that is pending in state court;

- Petitioning Creditors' claims against KP3 could have been brought in other venues, and their largest claim is subject to a mandatory arbitration provision;

- Petitioning Creditors' admitted purpose in bringing this proceeding is to "get paid as quickly as possible" on their disputed claims against KP3;

- The Petition is based solely on Petitioning Creditors' own disputed claims against KP3, and no other outstanding debts have been identified;

- KP3 had over $60 million in operating expenses in 2017, and 99% of its debt payments were timely;

- Even before accounting for bona fide disputes, Petitioning Creditors' claims make up less than 7% of KP3's 2017 operating expenses;

- Petitioning Creditors concede that KP3 is solvent, and that "the dispute in this case does not stem from KP3's inability to meet its obligations in the near or long term."

No court has sustained an involuntary petition on facts such as these. Faced with ever-mounting evidence undermining their Petition, Petitioning Creditors have shifted to arguing that they did not act in bad faith in commencing this Petition, but instead, it is KP3 that submitted itself to this involuntary Petition in bad faith. The argument turns the Bankruptcy Code on its head. Petitioning Creditors' conduct is precisely the conduct Section 303(b), (h) and (i) were intended to prevent. The Petition should be dismissed so KP3 can go back to being a solvent company that pays its many creditors on a timely basis.

## II.    JURISDICTION

This Court has jurisdiction over the case under 28 U.S.C. §§ 157 and 1334 and the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges and Authorizing Bankruptcy Appeals to be Decided by the Ninth Circuit Bankruptcy Appellate Panel*, dated November 27, 2013. This is a core proceeding under 28 U.SC. § 157(b).

## III.    BACKGROUND

### A.    Procedural Background.

This case was commenced on the Petition Date, January 2, 2018, at 5:01 p.m. On January 3, KP3 was served with a summons regarding the Petition. On January 19, the Petitioning Creditors filed an amended involuntary petition, but a summons has not been issued. On January 24, KP3 filed its Answer denying the allegations made in the Petition, asserting affirmative defenses that require dismissal of the Petition and attaching as Exhibit A a creditor list pursuant to FRBP 1003(b). On January 25, KP3 filed a motion seeking to limit notice to creditors, which was denied. On February 2, the Court issued an order that established discovery deadlines and certain initial trial dates. On February 14, KP3 filed an amended Answer attaching an amended creditor list (the "Creditor List"). On March 2 (the "Joinder Date"), SDCC joined the Petition. On March 8, the Court held a status conference and ordered the parties to meet and confer and submit a joint pre-trial statement by March 21. The parties met and conferred by telephone on March 17, 19, 21, 22 and 23, and filed a joint pre-trial statement (the "Pretrial Statement") on March 23, 2018. (Dkt. No. 47.) On March 28, 2018, the Court entered an order requiring the parties to file trial binders no later than April 3, 2018, to appear for the pretrial conference on April 6, 2018, and setting trial dates of April 9 and April 11, 2018. (Dkt. No. 49.)

### B.    KP3's Formation And Early Success.

KP3 is a California corporation formed in January of 2017 for the purpose of purchasing and selling event tickets. (Pretrial Statement ¶ 9) (the facts described in paragraphs 7 through 16 of the Joint Pretrial Statement submitted to the court on March 23, 2018 are undisputed). KP3 is 100% owned by an Employee Stock Ownership Plan Trust that is managed by two trustees. (*Id.* at ¶¶ 9, 14.)

Several of KP3's current and former principals are members of a single family, the Pancheri family. Prior to January of 2017: (1) brothers Erik Pancheri ("Erik")[1] and Ryan Pancheri ("Ryan"), operated REPS, a California corporation operating as an event ticket

---

[1] The parties are referred to by their first names hereinafter because many share the surname Pancheri.

brokerage; and (2) Robert Karr ("Robert") and John Pancheri (Erik and Ryan's cousin, "John"), operated ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a corporation also in the business of selling event tickets. Pretrial Statement at ¶ 11. All of KP3's current and former principals are veterans of the event ticket selling industry. *Id.* As of the Petition Date, KP3 had approximately fifteen employees operating from three locations in two states. *Id.* at ¶ 9.

When KP3 was formed, Robert, John, Ryan and Erik were named to its Board of Directors, Robert was appointed President and Chief Financial Officer, Ryan was appointed Vice-President, and Erik was appointed Secretary. Later, Ryan assumed the role Chief Executive Officer. Pretrial Statement at ¶ 12.  Erik, Ryan, Robert and John each signed substantially identical employment agreements with KP3 (the "Employment Agreements") pursuant to which KP3 employed each of them on a full time exclusive basis to render and perform ticket purchase, marketing, pricing, and sales services, and related services. Declaration of Robert Karr sworn to on April 3, 2018, and filed contemporaneously herewith (the "Karr Declaration") Exhs. BN and BO.  Among other things, the Employment Agreements obligated Erik, Ryan, Robert and John to "devote [their] full time, attention and effort to the performance of" their duties for KP3. (Karr Declaration Exs. BN, BO (Employment Agreements) at §§ 2.1-2.2).

Tom advised KP3 and its employees on corporate matters, and although not a lawyer, drafted documents for KP3's signature, communicated with KP3's attorney Ernie Ryder, and negotiated among Robert, John, Erik and Ryan to establish the business. (Pretrial Statement ¶ 13 and Deposition of Thomas J. Pancheri sworn to January 17, 2018 ("Tom Depo.").[2]

Although the business is just over a year old, unlike most start-ups, KP3 is both solvent and profitable. (Pretrial Statement at ¶ 9.) In 2017, overall revenues exceeded ▮▮▮▮▮▮ and expenses, in aggregate, totaled approximately $60 million. *Id.* KP3's earnings before interest, taxes, depreciation and amortization ("EBITDA") for the year 2017 was approximately $10,725,184. *Id.* As of the Petition Date, KP3 had assets in the amount of $19,404,489, no

---

[2] Tom was deposed on January 17, 2018; Erik on February 26; Ryan on February 26; Robert on March 9; and Adam Meislik of Force 10 Partners on March 9. Glen Jaffe of SDCC was deposed on March 20.

secured indebtedness, and liabilities of $11,699,724. *Id.* at ¶15. Other than Petitioning Creditors' claims, KP3's unsecured indebtedness primarily consists of payments due to ordinary course providers of goods and services, unsecured revolving working capital provided through credit cards, long and short term financing provided by insiders, and certain contractual obligations. *Id.* KP3 pays substantially all of its operating expenses and funded debt when due, and has or will have funds available to pay future expenses as they mature, or, in the case of disputed claims, become fixed. (Karr Declaration¶ 8.)

Petitioning Creditors concede that "the dispute in this case does not stem from KP3's inability to meet its obligations in the near or long term." (Pretrial Statement at ¶ 10.)

### C.    Petitioning Creditors' Bad Acts And The State Court Action.

The material circumstances leading to the commencement of this bankruptcy proceeding concern a dispute between KP3 and Erik and Ryan, who formerly served as officers, directors and employees of KP3. It was after their terminations, and in response to developments in the ensuing state court litigation, that Erik and Ryan (along with their father, Tom) used their control and influence over REPS, BLPT, and SDCC to orchestrate this Involuntary Proceeding. (*See infra*, Sec. III.D.)

For the reasons described in this Section III.C, KP3 terminated Ryan and Erik on October 24, 2017, and filed an action against them in state court (the "State Court Action"). The State Court Action alleges that Erik and Ryan breached their fiduciary duties and duties of loyalty to KP3, aided and abetted other KP3 employees in breaching their own duties to the company, and engaged in unfair competition. *See* KP3's Request for Judicial Notice ("RJN") at Ex. BX (First Amended Complaint)). On November 10, 2017, counsel for Erik and Ryan, Charles Hoge, sent KP3's counsel a letter enclosing a draft cross-complaint asserting five causes of action against KP3. (*See* Declaration of Fred Neufeld ("Neufeld Declaration") at Ex. J.) In his letter, Mr. Hoge stated his intention to file the cross-complaint once venue in the case was transferred from Orange County to San Diego County. (*Id.*)

The State Court Action has progressed little in the five months since it was filed, and is currently on hold pending a transfer of venue from Orange County Superior Court to San

Diego Superior Court. As defendants in the State Court Action, Erik and Ryan have exploited this delay to their advantage, and Erik has repeatedly evaded KP3's efforts to take their depositions. (*See infra*, Sec. V.B(iv).) But even without the additional evidence that discovery in the State Court Action is sure to uncover, KP3 has developed a powerful case against Erik and Ryan based on documents pulled from KP3's own corporate email and instant messaging systems. As described in the following sections, this evidence confirms that (1) Erik and Ryan systematically breached their fiduciary obligations and duties of loyalty to KP3, (2) Erik and Ryan encouraged KP3's other employees to breach their own duties to KP3, and (3) Erik and Ryan unfairly competed with KP3 by, among other things, using KP3's own employees and other resources to jumpstart a competing venture.

KP3 has and will continue to litigate the State Court Action in state court, and not in this bankruptcy proceeding. But given the Petitioning Creditors' assertions that this proceeding results from nothing more than KP3's "mean-spirited" efforts to stifle supposedly fair competition, it is important that the Court see why KP3 had little choice but to terminate Erik and Ryan, why their competitive acts have been anything but "fair," and why KP3 is confident that it will prevail on its claims against them in the State Court Action. Moreover, this background is critical to understanding the motivations of Erik, Ryan and Tom Pancheri in using their control and influence over REPS, the BLPT and SDCC to orchestrate the Involuntary Proceeding.

> ### i.    Erik and Ryan Secretly Used KP3's Own Employees To Provide Services To Their Competing Company.

The evidence reveals that no later than September 2017, less than eight months after the founding of KP3, Erik and Ryan were actively building a company to compete against KP3, and were using KP3's most valuable resources—its employees—to do so. On September 20, 2017, Erik and Ryan filed articles of incorporation for a company called "Team REPS, Inc." (RJN Ex. T.)  At his deposition, Ryan confirmed that while he was still employed by KP3, Team REPS, Inc. was formed as the entity for Erik and Ryan's new ticket business:

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮

Within days of registering Team REPS, Inc.[3] to do business, and while still serving as officers, directors and employees of KP3, Erik and Ryan were actively building their new company into a competitor of KP3. Erik and Ryan have argued, and will no doubt continue to argue, that their actions constituted "mere preparations" to compete with KP3, and do not give rise to liability under California law. But the distinction between actual competition and preparations to compete is irrelevant in this case because, *by September 2017, Erik and Ryan had enlisted many of KP3's own employees to secretly provide services to their new company*. Erik and Ryan's use of KP3's own employees, while those employees were still on KP3's payroll, was a misappropriation of corporate resources and an abuse of their positions at KP3. *See, e.g., Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400 (2007) ("The duty of loyalty embraces several subsidiary obligations, including the duty… 'not to acquire a material benefit from a third party in connection with … actions taken … through the agent's use of the agent's position"); *Am. Shooting Ctr., Inc. v. Secfor Int'l,* 2016 U.S. Dist. LEXIS 40523 (S.D. Cal. March 28, 2016) (an agent has a duty not to use the principal's property for the agent's own purposes or those of a third party (citing Rest. 3d Agency § 8.05)). Erik and Ryan are also liable for aiding and abetting these employees in their own violations of the duties they owed to KP3. The following is a non-exhaustive list of the evidence demonstrating that Erik and Ryan knowingly used KP3's employees to provide critical services to their competing ticket company:

---

[3] A subsequent Secretary of State filing dated and signed by Erik on October 10, 2017—while he was still with KP3—lists Team REPS' "type of business or service" as "WHOLESALE TICKET BROKER", and identifies Erik and Ryan as the company's officers and directors. (RJN Ex. AT.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[4] Slack is the internal instant messaging system used at KP3, which KP3 pays for on an annual subscription basis. (Karr Decl. at ¶ 39).

1

2

3

4

5

6

7

8

9

10

11

12

13

14 **ii.**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In fact, the evidence in the State Court Action will show that during the months preceding their termination Erik and Ryan had assembled a shadow team of KP3's own employees who—despite collecting a paycheck from KP3—were busy working for Erik and Ryan's new ticket company.

### iii. Erik And Ryan's Use Of KP3's Trade Secrets And Proprietary Information.

Besides using KP3's employees to build their competing company, the evidence developed thus far (and without the benefit of depositions in the State Court Action) demonstrates that Erik and Ryan were also using KP3's trade secrets and proprietary information.

      **iv.**    **Erik And Ryan Stopped Giving Their Full Time And Efforts To KP3, And Deferred Buying Opportunities For Their New Company.**

The evidence further demonstrates that in September and October 2017, Erik and Ryan were no longer interested in the success of KP3, and were consciously ignoring their duties to the company.



1 ███████████████████████████████████████████

2 ████████████████████

3 ██████████████████████████████████████████

4 ████████████████████████████████████████████

5 ███████████████████

6       **v.**    **Tom Pancheri Aided Erik And Ryan In Their Bad Acts.**

7     Tom Pancheri, who signed the Involuntary Petition on behalf of BLPT, has testified in

8 this proceeding that he was an "advisor" to KP3 and its four directors.[6] ███████████████

9 ██████████████████████████████ Yet the evidence shows that during the time

10 Tom purported to "advise" KP3, he was aiding Erik and Ryan in their efforts to harm the

11 company. For example, on September 26, 2017, Tom exchanged text messages with Erik

12 regarding the "need to order new AmEx cards ASAP under employee names. Would be great if

13 we could do it tonight."  (Ex. W at 50.) █████████████████████████

14 ███████████████████████████████████████████

15 ███████████████████████████████████████████

16 ███████████████████████████████████████████

17 ███████████████████████████████████████████

18 ███████████████████████████████████████████

19 ██████████████████████

20     The record is replete with other examples of Tom assisting Erik and Ryan with their

21 new company during the time that (1) Tom was acting as KP3's "advisor," and (2) Erik and

22 Ryan served as KP3's officers, directors and employees. (*See* Ex. W at 50-53 (assisting with

23 tasks for Erik and Ryan's new company); Ex. V at 53-59 (same). In one telling exchange prior

24 to their departure from KP3, Tom advises Erik and Ryan to conceal their competing venture

25 from KP3's other directors: "***I don't want to bring up that you already have a new corp***."  Ex.

26 DH.

27

28

---

[6] ██████████████████████████████████████████

1       **D.**     **The Involuntary Petition Was Orchestrated By Erik, Ryan And Tom**

2             **Pancheri.**

3       Erik, Ryan and Tom are not only key figures in the State Court Action, they

4 orchestrated this involuntary petition through their control and influence over the Petitioning

5 Creditors. First, REPS' involvement in the involuntary proceeding occurred at the direction of

6 Erik, Ryan and Tom, who serve are the sole officers and directors of REPS. (RJN at Ex. AS

7 (REPS Feb. 6, 2018 Sec. of State Filing)). Erik signed the Petition as REPS' President. Dkt.

8 No. 1. ████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████

11 ████████████████████████████████

12       Erik, Ryan and Tom also directed and coordinated BLPT's participation in this

13 involuntary proceeding. ████████████████████████████████████

14 ████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████

16 ███████████████████████████████████████████Tom Pancheri—despite

17 testifying that he is not the trustee of BLPT and has no formal relationship with the trust (Tom

18 Depo. at 14:24-15:14)—signed the Petition on behalf of BLPT (Dkt. No. 1), signed discovery

19 responses on behalf of BLPT (*see* Trial Ex. , and appeared for deposition as the self-described

20 "person most knowledgeable" for BLPT. ████████████████ ████████████████

21 ████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████

23       Even the joinder of SDCC was orchestrated by Ryan. █████████████████

24 ████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████

27 ██████████████████████████ ██████████████████████████████

28 ████████████████████████████████████████████████████████████



**IV.  PETITIONING CREDITORS CANNOT POSSIBLY MEET THEIR BURDEN TO SHOW THAT KP3 IS A COMPANY THAT WAS GENERALLY NOT PAYING ITS DEBTS AS THEY CAME DUE.**

Section 303(h) provides, in relevant part, that "the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if – the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(h).

Petitioning Creditors have the burden of proving that KP3 is a company that was generally not paying its debts as they came due as of the Petition Date. *Laxmi Jewel Inc. v. C&C Jewelry Mfg., Inc. (In re C&C Jewelry Mfg., Inc.)*, Nos. CC-08-1190-HMoMk, CC-08-1267-HMoMk, 2009 Bankr. LEXIS 4517, at *36 (B.A.P. 9th Cir. Apr. 14, 2009); (Pretrial Statement ¶ 26.) Petitioning Creditors must also prove that any unpaid debts are not "the subject of a bona fide dispute as to liability or amount." *Liberty Tool & Manufacturing v. Vortex Fishing Systems, Inc. (In re Vortex Fishing Systems, Inc.),* 277 F.3d 1057, 1066 (9th Cir. 2001); (Pretrial Statement ¶ 26.) KP3's bona fide dispute with each of the Petitioning Creditors' claims is discussed more fully in Section VI, *infra*. For purposes of this analysis, it is particularly relevant that, in addition to KP3's other defenses to enforcement of the debts,

there are material issues of fact regarding whether two of the three debts had even come due as of the Petition Date. Specifically, the evidence shows that the original REPS Line of Credit was superseded by a renewed line of credit that will not come due until April 10, 2018, and that the TJP Note (as defined below) was not yet in default at the time the Petition was filed. [(See *infra*, Sections VI.C. and VI.D.). Of course, if these debts had not yet "become due" as of the Petition Date, they cannot be used by Petitioning Creditors to carry their burden to show KP3 was generally not paying its debts under Section 303(h).

In an ordinary case, the Court would apply a totality of the circumstances test to determine whether petitioning creditors had met their burden. Here that test is not necessary. Petitioning Creditors already sunk their own case with the Pretrial Statement by falling short of their evidentiary burden. KP3 respectfully submits that this issue can be determined without trial. *See In re VitaminSpice*, 472 B.R. 282, 297 (Bankr. E.D. Pa. 2012) (if the only evidence on Section 303(h) standard is the failure to pay petitioning creditors' claims, such evidence alone usually will be insufficient to prove generally not paying debts as they come due (collecting cases)); *Laxmi*, 2009 Bankr. LEXIS 4517, at *37 (affirming summary judgment in favor of the alleged debtor where there was no genuine issue of material fact as to generally paying debts as they come due).

### A.    Petitioning Creditors Have Already Failed Their Evidentiary Burden

To meet their burden, Petitioning Creditors must do more than assert their own debts; they must "present evidence of . . . total debt and what amount of that debt is delinquent," and prove the issue by preponderance of the evidence, *In re VitaminSpice,* 472 B.R. 282, 297 (Bankr. E.D. Pa. 2012); *see also Liberty Tool v. Vortex Fishing Sys. (In re Vortex Fishing Sys.*), 277 F.3d 1057, 1072 (9th Cir. 2001) (requiring petitioning creditors to make a "general showing of the debtor's financial condition and debt structure"); *In re A&J Quality Diamonds*, *Inc.,* 377 B.R. 460, 464 (Bankr. S.D.N.Y. 2007) (petition dismissed due to "absence of proof about the number and amount of other creditors' claims, and the [d]ebtor's overall conduct of its financial affairs").

In this proceeding KP3 has produced over 1,000 pages of documents, **including all of its bank statements showing every payment it made in 2017**, submitted two expert reports, responded to interrogatories and requests for production, and appeared for deposition. (Karr Declaration ¶¶25-28); Declaration of Adam Meislik sworn to on April 3, 2018, and filed contemporaneously herewith (the "Meislik Declaration") ¶2. Yet in the Pretrial Statement, Petitioning Creditors do not make a single genuine allegation about KP3's financial condition or payment history outside of their own debts. (*See* Pretrial Statement ¶¶ 102, 103.) The closest is a factual allegation that substantially all KP3's liabilities are owed either to Petitioning Creditors or insiders (Pretrial Statement ¶ 103), but that allegation is not accompanied by a legal argument that would establish its relevance (See Pretrial Statement ¶¶ 68-70).

While many of the facts are undisputed in the Pretrial Statement, KP3 also asserts numerous facts that Petitioning Creditors at least purport to dispute. As evidence of those facts, KP3 has provided declaration testimony from Robert Karr, and expert declaration testimony from Adam Meislik based on bank statements, KP3's check register, credit card statements and a sample of vendor invoices and financing agreements (the "Data"). The Data consists entirely of records created in the ordinary course of KP3's business and records that were assembled by Robert Karr for the purposes of this case. All Data has been produced to Petitioning Creditors. Mr. Meislik's expert report (the "Meislik Report") provides a summary of the Data. His declaration also includes some supplemental analysis of the Data intended to support KP3's allegations listed as disputed in the Pretrial Statement.

Mr. Meislik is a Partner at Force Ten Partners, LLC ("Force 10"). Meislik Declaration ¶ 2. He has over twenty years' experience in restructuring and corporate finance. *Id.* at ¶ 3. He has been a Partner at Force 10 since June 2016. *Id.* at ¶ 4. In this capacity, he acts in various roles for clients including financial advisor, investment banker, chief restructuring officer, and expert witness in complex litigation matters. *Id.* His clients include companies, bank lenders and other secured and unsecured creditors, buyers, sellers, bankruptcy counsel and litigators, all in the context of workouts, insolvency proceedings, fund raising, mergers and acquisitions,

1    and litigation. He routinely provides expert testimony concerning transactions, intangible and

2    intellectual assets, valuations, solvency and reasonably equivalent value disputes. *Id.*

3        Force 10 was retained by KP3's prior counsel, Raines Feldman, LLP, to perform a

4    solvency analysis ("Solvency Analysis") of KP3 as of January 5, 2018 (the "Assessment

5    Date"). (Meislik Decl. at 2.) The Solvency Analysis was filed with the Court in support of the

6    Motion to Limit Notice (Dkt. and showed that KP3 was "wildly solvent" as of the Petition

7    Date, a conclusion that the Petitioning Creditors agree with. Pretrial Statement ¶ 9 ("KP3 is

8    both solvent and profitable."); Neufeld Decl. Ex. J (November 10, 2017 letter from Erik and

9    Ryan's counsel stating "KP3 has approximately ███████ in the bank and another ███████

10    in tickets-in-process. Its net profits in 2017 are very substantial."); ████████████████████

11    ██████████████████████████████████████████████████████████████████████████████████

12    ██████████████████████████████████████████████████████

13        At counsel's request, Force 10 performed a supplemental analysis of whether KP3 was

14    generally paying its debts as they came due as of the Petition Date. *Id.* On March 7, 2018, KP3

15    provided Force 10's supplemental analysis (the "Supplemental Report") to Petitioning

16    Creditors, Karr Declaration ¶27, and Petitioning Creditors deposed Mr. Meislik on Friday,

17    March 9, 2018, for just over thirty minutes. While Petitioning Creditors may uncover an

18    additional missed invoice, or dispute one tenth of one percentage point, crucially, they do not

19    dispute the headline numbers: KP3 debt payments in 2017 (including allegedly missed and late

20    payments) totaled $66,743,622 in 2017, and the Petitioning Creditors' claims would comprise,

21    at most, approximately 6.8% of that total. (Pretrial Statement ¶ 76.[7]) With the key facts

22    undisputed, any quibbles Petitioning Creditors might have with the particulars of the Meislik

23    Report cannot possibly be material.

24        The unrefuted facts show, <u>and the Petitioning Creditor have admitted</u>, that, except for

25    their own claims, Petitioning Creditors (i) "have not identified any facts that arose before the

26

27    ───────────────────────

28    [7] The Meislik Report shows that if all of Petitioning Creditors' claims were due and undisputed, their claims would make up 6.6% of total debt of $69,743,622. *See* Meislik Decl. ¶31. Petitioning Creditors disagree. KP3 believes the difference is not material, and has adopted Petitioning Creditors' calculation. (*See* Pretrial Statement ¶76.)

Petition Date that indicated that KP3 might be unable to pay its debts as they came due"
(Pretrial Statement ¶ 87) or "alleged any problem with the nature of KP3's conduct of its
financial affairs" (Pretrial Statement ¶ 88).

**B.      KP3 Is Generally Paying Its Debts As They Come Due Under The Totality Of The Circumstances Test**

The Ninth Circuit's totality of the circumstances test requires that Petitioning Creditors
make "a more general showing of the debtor's financial condition and debt structure than
merely establishing the existence of a few unpaid debts." *Liberty Tool v. Vortex Fishing Sys.
(In re Vortex Fishing Sys.),* 277 F.3d 1057, 1072 (9th Cir. 2001); *In re Bishop, Baldwin,
Rewald, Dillingham & Wong, Inc.,* 779 F.2d 471, 475 (9th Cir. 1985); Pretrial Statement ¶ 62
(undisputed law). This analysis leads to the inescapable conclusion that KP3 is generally
paying its debts as they come due.

**i.      Legal Standard For Totality Of The Circumstances Test**

In applying the totality of the circumstances analysis, courts in the Ninth Circuit are to
consider "the number of debts unpaid each month to those paid, the amount of the delinquency,
the materiality of the non-payment, and the nature of the debtor's conduct of its financial
affairs." *Vortex,* 277 F.3d at 1072; Pretrial Statement ¶ 62. "[I]t is not possible to lay down
guidelines that fit all cases . . . . It is intended that the court consider both the number and
amount [of debts] in determining whether the inability or failure is general." *Hujazi v.
Recoverex Corp. (In re Hujazi),* 2017 Bankr. LEXIS 1963, *26-27 (B.A.P. 9th Cir. July 14,
2017) (citing 2 Collier on Bankruptcy ¶ 303.31 (16th ed.) (internal citations omitted)).

The test is not intended to apply rigidly or mathematically, because
"Congress intended to provide a flexibility which is not reducible to a simplistic formula." *In
re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.,* 779 F.2d 471, 475 (9th Cir. 1985). The
legislative history of section 303(h) points to insistence by Congress on "generality of default."
*In re B.D. International Corp.,* 701 F.2d 1071, 1076 (2nd Cir. 1983).

The "generally not paying" test is to be applied as of the date of the filing of the
involuntary petition. *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.,* 779 F.2d 471,

475 (9th Cir. 1985); *Ash v. Moldo (In re Thomas)*, No. CC-03-1052-PMaPa, 2006 Bankr. LEXIS 4855, at \*21 (B.A.P. 9th Cir. July 25, 2006) (*Vortex* requires a court to consider "evidence of debtor's payment history of the debts, how much payments were, when they were due, whether they were being paid and, if not, for how long."); *In re St. Marie Dev. Corp. of Mont. Inc.*, 334 B.R. 663, 671 (Bankr. D. Mont. 2005). Because the test is applied as of the date of the filing of the petition, courts will not consider evidence of financial difficulties after the filing of the petition, *In re Better Care, Ltd.*, 97 B.R. 405, 408 (Bankr. N.D. Ill. 1989), and post-petition payments are generally excluded as well, *In re Win-Sum Sports, Ing.*, 14 B.R. 389, 392 (Bankr. D. Conn. 1981) ("post-petition payments ordinarily indicate a last ditch effort . . .to avoid bankruptcy proceedings.")

As articulated by the Ninth Circuit in *Vortex*, the totality of the circumstances test necessarily requires consideration of at least multiple months of the alleged debtor's payment history ("the number of debts unpaid *each* month to those paid") but, consistent with the flexible nature of the test, courts have examined a period appropriate to the circumstances of a particular case. The period is chosen based on the purpose of involuntary bankruptcy: to "protect all creditors from the loss occasioned by a company failing completely." *In re All Media Props., Inc.*, 5 B.R. 126, 148 (Bankr. S.D. Tex. 1980), *aff'd* 646 F.2d 193 (5th Cir. 1981) (debtor had spent several months paying only its most pressing bills). So, whereas an involuntary bankruptcy was appropriate after only eight days of investors demanding their money after the debtor had engaged in a criminal Ponzi scheme (*In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 779 F.2d 471, 475 (9th Cir. 1985)), an involuntary petition was denied where the alleged debtor company demonstrated five years of progress in repaying old debts. *See Vortex*, 277 F.3d at 1062. One year is a particularly common measure. *See e.g. In re Food Gallery*, 222 B.R. 480, 487 (Bankr. W.D. Pa. 1998) (looking at debtor's loans and payments to trade creditors over the course of a year); *see also In re Apollo Health St., Inc.*, No. 11-22970 (NLW), 2011 Bankr. LEXIS 1838, at \*21 (Bankr. D.N.J. May 18, 2011) and *In re ELRS Loss Mitigation, LLC*, 325 B.R. 604, 632 (Bankr. N.D. Okla. 2005).

1     Courts will also consider how long unpaid debts have been outstanding. *In re Reed*, 11

2   B.R. 755, 760 (Bankr. S.D. W.Va. 1981) ("A default of short duration should be viewed

3   differently than one which is longer."). Courts typically only find an alleged debtor was

4   generally not paying most of its debts after delinquencies of many months. *See e.g., Focus*

5   *Media, Inc. v. NBC (In re Focus Media, Inc.)*, 378 F.3d 916, 929 (9th Cir. 2004) (80% of debts

6   had been over 90 days old for several months); *In re All Media Props.*, 5 B.R. at 148 (debtor

7   "did not even pay the interest on the smallest of the notes even though it had been due for over

8   two years in some instances."). Petitions have been denied based on shorter durations, even

9   lasting several months. *See Laxmi Jewel Inc. v. C&C Jewelry Mfg., Inc. (In re C&C Jewelry*

10  *Mfg., Inc.)*, Nos. CC-08-1190-HMoMk, CC-08-1267-HMoMk, 2009 Bankr. LEXIS 4517, at

11  *36 (B.A.P. 9th Cir. Apr. 14, 2009) (47% of debt over 120 days past due does not demonstrate

12  debtor was generally not paying its debts as they came due); *In re Leek,* 52 B.R. 311, 314

13  (Bankr. M.D. Fl. 1985) (petition dismissed where 95% of invoices in number and 97% of

14  invoices in amount paid within 60 days, excluding disputed claims).

15     In fact, where a debt is outstanding for "a very short time," courts may not even

16  consider it past due at all, *see In re Better Care, Ltd.*, 97 B.R. 405, 409 (Bankr. N.D. Ill. 1989),

17  particularly if "no demand is made on the debtor [and] the debtor is not notified of or billed for

18  the debt." *Boston Beverage Corp. v. Turner*, 81 B.R. 738, 746 (D. Mass. 1987).

19     Perhaps the most strongly predictive factor is the alleged debtor's ability to pay. *See*

20  *e.g. Focus Media, Inc. v. NBC (In re Focus Media, Inc.),* 378 F.3d 916, 929 (9th Cir. 2004)

21  ("no plan or ability to pay debts"); *Hujazi v. Recoverex Corp. (In re Hujazi),* 2017 Bankr.

22  LEXIS 1963, *26-27 (B.A.P. 9th Cir. July 14, 2017) (petition granted when individual debtor

23  had almost $2 million in claims and no ability or plan to pay); *Morabito v. JH, Inc. (In re*

24  *Morabito)*, 2016 Bankr. LEXIS 2207, at *22-29 (petition granted where individual debtor had

25  $13 million in claims and no ability or plan to pay); *Marciano v. Fahs (In re Marciano),* 459

26  B.R. 27, 52 (BAP 9th Cir. 2011) (petition granted where individual debtor had hundreds of

27  millions in claims and no ability to pay); *cf. Laxmi Jewel Inc. v. C&C Jewelry Mfg., Inc. (In re*

28  *C&C Jewelry Mfg., Inc.)*, Nos. CC-08-1190-HMoMk, CC-08-1267-HMoMk, 2009 Bankr.

LEXIS 4517, at *37 (B.A.P. 9th Cir. Apr. 14, 2009) (dismissal of petition affirmed where debtor was an operating company and there was "no evidence demonstrating" that company "cannot meet its payment obligations"). Courts may excuse missed payments if they have "nothing to do with inability to pay the obligations." *In re Apollo Health St., Inc.*, No. 11-22970 (NLW), 2011 Bankr. LEXIS 1838, at *21 (Bankr. D.N.J. May 18, 2011).

Closely related are the alleged debtor's solvency and profitability. Involuntary petitions against solvent debtors are scrutinized closely. *See In re Goldsmith*, 30 B.R. 956, 963-64 (Bankr. E.D.N.Y. 1983) (concerns about creditor motivations "are particularly compelling in a case with a clearly solvent debtor"); *see also Laxmi*, 2009 Bankr. LEXIS 4517, at *37 (dismissing involuntary petition in which alleged debtor had more assets than liabilities).

When a debtor is not operating, large debts loom particularly large. See, e.g., *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 779 F.2d 471, 475 (9th Cir. 1985) (petition granted when debtor not operating with no ability or plan to pay); *Concrete Pumping Serv., Inc. v. King Constr. Co.*, 943 F.2d 627, 629 (6th Cir. 1991) (alleged debtor was "an empty husk," its owner having extracted assets via undocumented loans); *In re Euro-American Lodging Corp.*, 357 B.R. 700, 713 (Bankr. S.D.N.Y. 2007) (petition granted where petitioning creditor held 90% of debts, alleged debtor had been in default for 15 years, never had a bank account and never paid a creditor).

### ii. By Number, Amount And Materiality, KP3's Alleged Delinquencies Are Far from General

The first three factors of the totality of the circumstances test – "the number of debts unpaid each month to those paid, the amount of the delinquency, [and] the materiality of the non-payment" – all weigh is favor of dismissing the Petition, even assuming Petitioning Creditors' allegations about KP3's delinquencies are true. Meislik Decl. ¶¶14-28.

Though the factors favor dismissal of the Petition when viewed over any time horizon, KP3 submits that its alleged debts to the Pancheri Creditors should be compared against KP3's total timely debt payments since January 2017. The agreements with the Pancheri Creditors that underlie their claims were all part of the initial organization and capitalization of KP3. See

1  (Trial Exhibit AM (REPS Rog. Response) at No. 4 (REPS LOC and TJP Note were extended

2  to KP3 "in connection with the formation of the business in January 2017."); Trial Exhibit AL

3  (BLPT Rog. Response) at No. 3 (TJP Loan made "relative to the formation of KP3").)   The

4  alleged debts are best viewed in the context of KP3's full one year of corporate existence. A

5  time horizon of the year comports with the case law, and Petitioning Creditors do not allege

6  that there have been any intervening events that might render the comparison inaccurate. *See In

7  re ELRS Loss Mitigation, LLC*, 325 B.R. 604, 631 (Bankr. N.D. Okla. 2005) (alleged debtor

8  "paid over 200 creditors a total in excess of $ 800,000 in the year prior to the filing of the

9  petition.")

10  **Number of Alleged Delinquencies**. The Meislik Report shows that KP3 made 1,047

11  timely debt payments in 2017, against 11 payments missed, late or unpaid, for a timely

12  payment percentage of more than 99% by amount.[8] Meislik Report, 5. As of the Petition Date,

13  KP3 had a total of six payments outstanding. Meislik Decl. ¶ 22. Looking at each month it is

14  undisputed that KP3 had no material late or missed debt payments in January, February,

15  March, April, May, June, July, August, September or October of 2017. Pretrial Statement ¶¶

16  79-80. Petitioning Creditors contend that in November, KP3 did not make two payments (on

17  account of the Purchase Agreement and the REPS LOC), but KP3 did make timely payments

18  to 38 different creditors. Meislik Decl. ¶24. Petitioning Creditors contend that between

19  December 1, 2017 and the Petition Date KP3 missed four payments (REPS LOC, TJP Note,

20  two SDCC invoices); yet KP3 made timely payments to 32 different creditors in December.

21  Meislik Decl. ¶25.  So in the final two months of 2017, KP3 did not make six payments to

22  three creditors, but made timely payments to 70 creditors. Petitioning Creditors assert that KP3

23  missed only two scheduled payments to each of SDCC and REPS prior to the Petition Date.

24  Thus, there were precisely zero creditors to whom KP3 was "regularly missing payments" as of

25

26

27

28

[8] The Meislik Report is based on an initial production of documents and KP3's check register, as described more fully in the Meislik Decl. at ¶7.  On March 23, 2018, KP3 made a supplemental production. Mr. Meislik reviewed the supplemental production and concluded that they did not materially alter the analysis or conclusions in the Meislik Report. The analysis contained herein is based on the Meislik Report, for consistency. However, the Meislik Decl. set forth Force 10's supplemental analysis based on the supplemental production, where appropriate.

the Petition Date. *See e.g. In re All Media Props.*, Inc., 5 B.R. 126, 148 (Bankr. S.D. Tex. 1980), *aff'd* 646 F.2d 193 (5th Cir. 1981) (petition granted where debtor had spent several months paying only its most pressing bills).

**Amount of Alleged Delinquencies**. Petitioning Creditors allege that KP3 was delinquent by \$4.5 million as of the Petition Date. *See* Pretrial Statement ¶ 125. But, it is undisputed that KP3's debt payments in 2017 (including allegedly missed and late payments) totaled \$66,743,622 in 2017 and that even if all of Petitioning Creditors' claims were undisputed and matured, their claims would comprise at most approximately 6.8% of that total. Pretrial Statement ¶76. The percentage would be even smaller if the Court finds that the Pancheri Creditors' claims were either unmatured or subject to a bona fide dispute. If the \$1,000,000 TJP Note claim asserted by BLPT was matured and undisputed on the Petition Date, but the REPS Purchase Agreement and LOC claims were excluded, the TJP Note claim would comprise 1.5% of KP3's total 2017 debt of \$65,595,092. Meislik Report, 6. If the \$2,139,530 Purchase Agreement claim was matured and undisputed, but the TJP Note claim and the REPS LOC claims were excluded, the Purchase Agreement claim would comprise 3.2% of KP3's total 2017 debt of \$66,734,622. *Id.* If the REPS LOC claim was matured and undisputed, but the TJP Note claim and the REPS Purchase Agreement claim were excluded, the \$1,450,000 debt would make up 2.2% of KP3's total 2017 debt of \$66,045,092. Meislik Report, 6.

Looking by month, it is undisputed that KP3 had no material delinquencies in January, February, March, April, May, June, July, August, September or October of 2017. Pretrial Statement ¶¶ 79-80. In November, KP3 did not make payments totaling approximately \$2.2 million (related to the Purchase Agreement) but made payments totaling approximately \$7.3 million to other creditors. Meislik Decl. ¶ 27. KP3 missed payments totaling approximately \$2.5 million between December 1 and the Petition Date, but made payments in December totaling approximately \$8.5 million. Meislik Decl. ¶ 28.

**Materiality of Non-Payment**. As of the Petition Date, an interest payment on the REPS LOC was 84 days past due, the payment on the Purchase Agreement was approximately

30 days past due, and the TJP Note was at most two (non-business) days past due. Each falls far short of the durations of delinquency that have supported a finding that an alleged debtor was generally not paying its debts as they come due. *See e.g. In re Hujazi,* Case No. 13-30477, 2015 Bankr. Lexis 4560, at *24 (Bankr. N.D. Cal. November 30, 2015) (where alleged debtor paid interest on obligation but erratically, and failed to make balloon payment that was due on petition date, court finds "failure to make balloon payment due on [petition date] cannot be counted against her because of filing of the involuntary petition).

Also, for each alleged delinquency, KP3 has a reason for non-payment that has "nothing to do with the inability to pay." *See e.g. In re Apollo Health St., Inc.,* No. 11-22970 (NLW), 2011 Bankr. LEXIS 1838, at *21 (Bankr. D.N.J. May 18, 2011) (there were credible "reasons a claimant might not be paid timely"); Pretrial Statement ¶ 79 (undisputed that "none of KP3's late payments can be attributed to a lack of liquidity or financial wherewithal"). For the TJP Note, KP3 did not receive proper notice of assignment by the Petition Date. KP3 and ██████ elected to delay the interest payment on the ██████ LOC because it came due during the tumultuous period surrounding Erik and Ryan's departure from KP3. (Karr Declaration ¶22.) The "non-payment of SDCC's claim timely was due to the cancellation of a credit card in Ryan's name after his employment was terminated by KP3." (Pretrial Statement ¶ 77 (undisputed fact)). For all its alleged debts to Pancheri Creditors, KP3's conflict with the Pancheri Creditors is a reason for non-payment that had nothing to do with inability to pay— even if the Court finds that those reasons were not bona fide for purposes of section 303(b).

### iii.    KP3's Exceptional Payment History

KP3's delinquencies—while negligible—tell only part of the story, and must be measured against KP3's exceptional payment history and financial condition.

It is undisputed that "████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
(Pretrial Statement ¶ 78; Karr Declaration ¶ 10; Meislik Decl. ¶ 18.) ██████████████████

1 ███████████████████████████████████████████████████

2 █████████████████

3        **iv.**     **As Petitioning Creditors Well Know, KP3 Is a Thriving Company**

4      Beyond looking at debt payment history, courts look at "the nature of the debtor's

5 conduct of its financial affairs," including the alleged debtor's overall financial health, its

6 profitability, and its ability to pay creditors. *See Vortex*, 277 F.3d at 1072. Petitioning Creditors

7 openly acknowledge that KP3 is generating "extraordinary profits." Pretrial Statement ¶ 21. It

8 is also undisputed that:

9     •  "As of the Petition Date and at all relevant times, KP3 was solvent, operating and

10       generating a profit." Pretrial Statement ¶ 85.

11     •  "As of the Petition Date, KP3 had assets in the amount of $19,404,489, no secured

12       indebtedness, and liabilities of $11,699,724" Pretrial Statement ¶ 15.

13     •  "KP3 has sufficient cash on hand as of the Petition Date to pay all of its outstanding

14       debts, including the debts of Petitioning Creditors," Pretrial Statement ¶ 75, as they

15       come due.

16     •  "No facts have been alleged that suggest any threat to KP3's continued ability to

17       satisfy all of its debts, current or future." Pretrial Statement ¶ 85.

18     •  "Petitioning Creditors' primary basis for alleging that KP3 was not paying its debts

19       as they come due between October 23, 2017 and the Petition Date was KP3's non-

20       payment of the claims of Petitioning Creditors." Pretrial Statement ¶ 86.

21     •  "Except for KP3's non-payment of their claims, Petitioning Creditors have not

22       identified any facts that arose before the Petition Date that indicated that KP3 might

23       be unable to pay its debts as they came due." Pretrial Statement ¶ 87.

24     •  "Except for KP3's non-payment of their claims, Petitioning Creditors have not

25       alleged any problem with the nature of KP3's conduct of its financial affairs."

26       Pretrial Statement ¶ 88.

27      The undisputed facts conclusively establish "the nature of the debtor's conduct of its

28 financial affairs" and weigh heavily in favor of dismissing the Petition. *Vortex*, 277 F.3d at

1072. Petitioning Creditors are attempting to force a thriving company into bankruptcy reorganization or liquidation solely to advance their individual grievances.

### C.    Petitioning Creditors Cannot Satisfy Their Burden Under 303(h)

Against the overwhelming evidence that KP3 is generally paying its debts under the totality of the circumstances test, Petitioning Creditors argue that (i) "there is precedent for allowing an involuntary petition based on non-payment of a few large debts" (Pretrial Statement ¶ 65); (ii) that "KP3's outstanding debts to Petitioning Creditors should be compared to KP3's average monthly operating expenses" (Pretrial Statement ¶ 63); and (iii) "that bad faith in not paying the large debts owed to Petitioning Creditors amounts to circumstances that justify involuntary relief." (Pretrial Statement ¶ 64). Viewed in light of the case law discussed above, those first two arguments can be dispensed with in short order. The third is without merit but requires more of an explanation.

### i.    Petitioning Creditors' "Large Debts" Argument

Petitioning Creditors are correct that a debtor could be generally not paying its debts based on non-payment of a few large debts, even if it is remaining current on small payments to recurring creditors. They rely on *In re Bowers*, 16 B.R. 298 (Bankr. D. Conn. 1981) and *In re Int'l Teldata Corp.,* 12 B.R. 879, 883 (Bankr. D. Nev. July 24, 1981). They have set a high bar for themselves on that factor: In *Bowers* and *International Teldata*, the alleged debtors had not, and could not, pay at least 90% and 82% of their debts, respectively. *See also In re Garland Coal & Mining Co.,* 67 B.R. 514, 522 (Bankr. W.D. Ark. 1986) (not paying "well over fifty percent of the outstanding liabilities"). Here, KP3 generally has been paying more than 95% of its debts, both in the number of debts and dollar amount of debts, for all of its one year of corporate existence.

Moreover, in substantially all the cases where relief is entered on the basis of a single large debt, the debtor is an individual, or a non-operating entity, the petitioning creditor is a judgment creditor or a creditor who has held a claim for many years, and the alleged debtor has no ability to pay the judgement debt. *See e.g.*, *Morabito v. JH, Inc. (In re Morabito)*, No. NV-14-1593-FBD, 2016 Bankr. LEXIS 2207, at *9 (B.A.P. 9th Cir. June 6, 2016) (petition granted

where alleged debtor was an individual, creditor held a liquidated $13 million judgment that represented 98% of the claims against the debtor, and debtor had no ability to satisfy the judgment); *In re Euro-American Lodging Corp.*, 357 B.R. 700, 713 (Bankr. S.D.N.Y. 2007) (petition granted where petitioning creditor held 90% of debts, alleged debtor had been in default for 15 years, never had a bank account and never paid a creditor); *Focus Media, Inc. v. NBC (In re Focus Media, Inc.)*, 378 F.3d 916, 929 (9th Cir. 2004) (petition granted where alleged debtor had millions of dollars in unpaid bills that were more than 120 days past due, debtor had no plans or ability to pay them, and there was no evidence at all that debtor was making any efforts to pay them); *In re Garland Coal & Mining Co.*, 67 B.R. 514, 522 (Bankr. W.D. Ark. 1986) (petition granted where alleged debtor company was no longer operating most of its coal mining business, owed nearly $2 million to its employee pension fund, and generally was not paying "well over fifty percent of the outstanding liabilities"); *In re Huggins*, 380 B.R. 75, 81 (Bankr. M.D. Fla. 2007) (petition granted where the alleged debtor, an individual, had been found to be a key player in a Ponzi scheme and a judgment had been entered against the debtor for more than $7.9 million, and the debtor admitted he had no ability to make any payments on the debt; the court held that special circumstances also applied because the debtor transferred property to his wife soon after entry of the judgment, using fraud, artifice and sham to thwart collection of the debt); *In re Int'l Teldata Corp.*, 12 B.R. 879, 883 (Bankr. D. Nev. 1981) (petition granted where alleged debtor was not paying 82% of its outstanding obligations, and there was no evidence of the debtor being able to pay those claims in the foreseeable future); *In re Molen Drilling Co.*, 68 B.R. 840 (Bankr. D. Mont. 1987) (petition granted where alleged debtor, an oil drilling company, had stacked its rigs and shut down operations due to a slowdown in the industry, and was therefore unable to pay the $3.5 million it owed to Norwest Bank, and was only able to pay $13,000 in the aggregate to its small creditors during the three months prior to the petition); *In re Tikijian*, 76 B.R. 304 (Bankr. S.D.N.Y. 1987) (petition granted where the alleged debtor, an individual, owed millions of dollars in debts to a group of banks based upon personal guaranties of his company's debts, his company already being in bankruptcy, and the debtor having admitted to

gambling at the rate of more than $500,000 per month); *In re Paper I Partners*, 283 B.R. 661(Bankr. S.D.N.Y. 2002) (petition granted where the matured and unpaid debt of the alleged debtor equaled 73% of the total debt, and after failed tender offer the debtor was unable to pay the debts). These cases are all inapposite to KP3's case, where KP3 is an operating, solvent company that has sufficient cash on hand to pay Petitioning Creditors' claims.

Against this backdrop, Petitioning Creditors are only left to argue that that bad faith in not paying the large debts owed to Petitioning Creditors amounts to circumstances that justify involuntary relief. But "special circumstances" is a judicial gloss on judicial gloss, that, if applied in this case, would run afoul of the clear and unambiguous language of the statute. Petitioning Creditors' case cannot stand.

### ii. Petitioning Creditors' Comparison Of Debt To One Month's Operating Costs

Petitioning Creditors' propose to compare their alleged debts to a single month of KP3's operating expenses. Pretrial Statement ¶ 63. There is nothing wrong with that comparison in theory. The number of debts unpaid each month compared to the debts paid are both factors in the totality of the circumstances test. *Vortex*, 277 F.3d at 1072. That said, Petitioning Creditors are presumably suggesting that the court should simply take a single month's operating expenses and divide it by $4.5 million to generate a percentage. Their proposed comparison is self-evidently designed to make their debt loom as large as possible, comparing a monthly measure against funded debt intended to be repaid over a longer duration. Moreover, even if the Petitioning Creditors could turn up a case in which such a comparison was employed, it would still only be one factor in the totality of the circumstances test. And using it would make no sense here, because KP3 does not need the proceeds of operations to repay Petitioning Creditors—it has sufficient cash on reserve. (Pretrial Statement ¶ 16; Karr Declaration Ex. CG through CT.)

Yet even in this best-case scenario for Petitioning Creditors their alleged debts as of the Petition Date are still less than KP3's average monthly operating expenses—which they concede the company timely pays. (Pretrial Statement ¶¶78-88.) In November 2017, KP3 paid

$7.3 million in debts and in December 2017, KP3 paid $8.5 million in debts, in each case almost double the aggregate amount of the Petitioning Creditors' claims. Thus, even under their own slanted standard, Petitioning Creditors cannot prevail.

Petitioning Creditors alternatively propose that the Court should compare their debt to KP3's outstanding obligations on a single day, the Petition Date, and exclude obligations to insiders, Pretrial Statement ¶103, presumably relying on the oft-cited proposition that the totality of the circumstances are to be evaluated as of the Petition Date. *See*, *e.g.*, *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 779 F.2d 471, 475 (9th Cir. 1985).

They may argue that KP3 had approximately $12 million in outstanding obligations on the Petition Date, of which approximately $10 million was funded debt to insiders, including $3.5 million to REPS and ▮▮▮▮▮▮▮▮▮▮▮ $1 million was owed to BLPT, and approximately ▮▮▮▮ was owed on credit card obligations. Assuming for purposes of argument that these figures are accurate (and they are not), Petitioning Creditors would presumably have the Court compare their $4.5 against the purported $5 million owed to REPS and the "non-insiders." By this metric, Petitioning Creditors' claims make up virtually 100% of KP3's obligations, but the metric has no basis in reality, let alone the totality of the circumstances test.

The totality of the circumstances test does not exclude insiders. *See Vortex*, 277 F.3d at 1072. Courts have credited alleged debtors for being current on loans from insiders. *In re Brooklyn Res. Recovery*, 216 B.R. 470, 485 (Bankr. E.D.N.Y. 1997) (being current on loans from shareholders weighed in favor of alleged debtor). On the other hand, an inability to make payments to insiders can lead to a finding that a company is generally not paying its debts, even if insiders have agreed to defer payment. *See In re All Media Props., Inc.*, 5 B.R. 126, 147-48 (Bankr. S.D. Tex. 1980) ("The fact that a debtor is not paying 'insiders' who happen to be creditors, and that those 'insiders' are not pressing for payment does not negate the fact that the debtor was not paying its debts as they became due"); *In re Int'l Teldata Corp.*, 12 B.R. 879, 882 (Bankr. D. Nev. July 24, 1981) (alleged debtor being unable to make payments to insiders weighs in favor of petitioning creditor). Here, unlike in *International Teldata* and *All*

1    *Media*, KP3's insiders are not keeping it afloat by deferring payments. KP3 has remained

2    current on all of its debts to its insiders, excepting one late interest payment, and there is no

3    threat to KP3's continued ability to satisfy its debts, including debts to insiders. *See* Pretrial

4    Statement ¶ 85. KP3's demonstrated ability to remain current on insider loans weighs in its

5    favor of showing that it is a company that generally pays its debts as they come due.

6        The totality of circumstances test also cannot be "reduc[ed] to a simplistic formula" that

7    only measures KP3's debts as of the Petition Date.  *See In re Bishop, Baldwin*, 779 F.2d at 475.

8    The most basic formulation of the *Vortex* test requires an evaluation of how many debts the

9    debtor *has paid each month* against how many debts the debtor *has not paid*. *See Vortex*, 277

10   F.3d at 1072. Petitioning Creditor's formula would ignore KP3's already paid operating

11   expenses because they were no longer due on the Petition Date, ignore all of KP3's funded

12   debt because it happened to be provided by insiders, and include only the outstanding operating

13   expenses due on one particular day chosen by Petitioning Creditors—which happens to be the

14   first business day of a new year, and the first possible day on which the TJP Note matured, and

15   the only remaining debt is the debt to Petitioning Creditors on account of their disputed claims.

16   Petitioning Creditors seek to isolate one particular metric that obscures more than it reveals—

17   an approach not supported by case law. *See e.g. In re ELRS Loss Mitigation, LLC*, 325 B.R.

18   604, 632 (Bankr. N.D. Okla. 2005) (under the totality of the circumstances test, petition

19   dismissed because in the year prior to the filing of the petition alleged debtor paid 200 creditors

20   in excess of $800,000, compared to $80,000 in unpaid claims on the petition date,

21   approximately $70,000 of which were disputed, the unpaid remaining claims were less than

22   thirty days past due, and "[g]iven the number of creditors which [the alleged debtor] has paid

23   on a regular basis and the amount they have been paid," the alleged debtor was generally

24   paying its debts.)

25       In *In re Apollo Health St., Inc*., Case No.  11-22970, 2011 Bankr. LEXIS 1838 (Bankr.

26   D. NJ. May 18, 2011), the facts are very similar to the instant matter. There, the petitioning

27   creditors introduced testimony that their claims of approximately $4 million comprised 75% of

28   the third-party accounts payable on the Petition Date.  The alleged debtor moved to dismiss on

the grounds that it was generally paying its debts as they come due, and the parties deferred consideration of whether the petitioning creditors' claims were disputed. The court assumed for purposes of its analysis that the claims were undisputed. *Id.* at *18. Alleged debtors provided testimony of their CFO and a financial expert. Unlike this case, petitioning creditors submitted a counter-expert. Petitioning creditors argued that their claims constituted 75% of third-party payables on the petition date, and that the claims may be over 120 days' old. The court dismissed the petition. First, the court noted that the alleged debtor was an operating company, and "the filing of an involuntary petition is an extreme remedy with serious consequences to the alleged debtor, such as loss of credit standing, inability to transfer assets and carry on business affairs, and public embarrassment." *Id.* at *16 (citing *In re Reid*, 773 F.2d 945, 946 (7th Cir. 1985)). Applying the totality of the circumstances test (*id.* at *19), the court first evaluated the number of paid and unpaid claims and concluded that the debtor was paying almost all of its creditors on a timely basis and had done so for some time (*id.* at *20), and the business transacts with hundreds of vendors and other third parties annually. *Id.* With regard to the materiality of the non-payments, the court compared the petitioning creditors' $4 million of unpaid claims, against $70 million in annual operating expenses that were being paid, which readily compelled the conclusion that the non-payments were not material. The court further noted the reasons the company might not have paid claims had nothing to do with inability to pay, *id.* at *21, the company generates ███████ in cash monthly, had a fully available line of credit in the amount of ███████ no litigation that amounts to collection activity, and not in breach of any bank loan covenants. *Id.* at 23; *see also In re St. Marie Dev. Corp. of Mont. Inc.*, 334 B.R. 663, 671 (Bankr. D. Mt. 2005) (petition dismissed even where petitioning creditors' claims constituted approximately 66% of the debt, where majority of such debt was to former insiders, new management was keeping bills current, and petitioning creditors engaged in serious misconduct).

In certain cases where the totality of the circumstances have not varied from day to day or month to month, courts have found that a debtor was generally not paying its debts based snapshot of an alleged debtor's debts on the petition date. That can be appropriate where, for

1    example, a debtor is not an operating business. For such a debtor, their debts on any given day

2    (petition date or otherwise) will be more or less the same. *See, e.g., In re Euro-American*

3    *Lodging Corp.*, 357 B.R. 700, 713 (Bankr. S.D.N.Y. 2007) (alleged debtor, a real estate

4    holding company was the borrower on a secured loan that had been in default for 15 years, the

5    debtor never had a bank account and never paid a creditor, and the petitioning creditor held

6    90% of the debt); *Focus Media, Inc. v. NBC (In re Focus Media, Inc.)*, 378 F.3d 916, 929 (9th

7    Cir. 2004) (substantial amounts of unpaid bills and no plans or ability to pay them). But for an

8    operating solvent debtor (like KP3), that pays its obligations as they come due, Petitioning

9    Creditors' comparison would punish it for doing exactly what Congress was trying to ensure it

10   was doing – paying its debts as they come due.

11       Petitioning Creditors' test is the wrong test. The correct test looks at payments over

12   time, including all operating expenses and funded debt, which KP3 is unquestionably paying.

13   *See Vortex*, 277 F.2d at 1072; *In re All Media Props., Inc.*, 5 B.R. 126, 144 (Bankr. S.D. Tex.

14   1980), *aff'd* 646 F.2d 193 (5th Cir. 1981) ("[P]ayment of debts prior to the filing of the petition

15   would, of course, be a valid defense to an involuntary petition."). Of course, where appropriate,

16   a court may deny a petition based on a snapshot of the alleged debtor's outstanding debt as part

17   of the totality of the circumstances test. *See e.g. Laxmi Jewel Inc. v. C&C Jewelry Mfg., Inc.*

18   *(In re C&C Jewelry Mfg., Inc.),* Nos. CC-08-1190-HMoMk, CC-08-1267-HMoMk, 2009

19   Bankr. LEXIS 4517, at *37 (B.A.P. 9th Cir. Apr. 14, 2009 (47.4% of the total invoices open

20   for over 120 days does not demonstrate general non-payment; also considering assets greater

21   than liabilities, payroll obligations, payroll taxes, corporates taxes all current, post-petition

22   payments current, and there is no evidence of material non-payments or inability to meet

23   payment obligations).

24          **iii.    Petitioning Creditors' "Bad Faith" Argument**

25       Petitioning Creditors also argue KP3's "bad faith in not paying the large debts owed to

26   Petitioning Creditors amounts to circumstances that justify involuntary relief." Pretrial

27   Statement ¶ 69. By bad faith, they are presumably referring to their allegation that KP3 did not

28   pay them for a "non-commercial, mean-spirited" reason. Pretrial Statement ¶ 5. The argument

1    is baseless. Section 303(h) expressly provides that relief under section 303 is **only** available

2    when the debtor is generally not paying its debts as they come due. 11 U.S.C. § 303(h).

3    Involuntary bankruptcy is designed to "protect all creditors from the loss occasioned by a

4    company failing completely." *In re All Media Props*., Inc., 5 B.R. 126, 148 (Bankr. S.D. Tex.

5    1980), aff'd 646 F.2d 193 (5th Cir. 1981). It "was not intended to address the special

6    grievances, no matter how legitimate, of particular creditors of a business otherwise holding its

7    own." *In re Brooklyn Res. Recovery, Inc*., 216 B.R. 470, 486 (Bankr. E.D.N.Y. 1997).

8        Petitioning Creditors appear to be misapplying a line of cases carving out an exception

9    to an exception that is no longer the law, if it ever was. Early cases questioned whether a

10   debtor that had only a single creditor could ever be "generally not paying" if it was only not

11   paying one person.  *See e.g. Concrete Pumping Serv., Inc. v. King Constr.* Co., 943 F.2d 627,

12   629 (6th Cir. 1991); *In re BDI,* 701 F.2d 1071 (2d Cir. 1983). The earliest decisions concluded

13   not, establishing an "almost per-se rule", and subsequent courts carved out an exception,

14   holding that the court can grant relief if there are special or exceptional circumstances. The

15   courts applying the almost per se rule will make an exception only where there is "(1) an

16   exceptional case of a debtor with a sole creditor who would otherwise be without an adequate

17   remedy under State or Federal law (other than bankruptcy law) if denied an order for relief or

18   (2) a showing of special circumstances amounting to fraud, trick, artifice or scam." *Id.* (quoting

19   *In re 7H Land & Cattle Co*., 6 B.R. 29, 34 (Bankr. D. Nev. 1980). Petitioning Creditors

20   contend that the so-called "almost per se" rule applies here, because their claims, in aggregate,

21   constitute virtually 100% of the unpaid non-insider debt on the Petition Date. *See Morabito v.*

22   *JH, Inc. (In re Morabito),* No. NV-14-1593-FBD, 2016 Bankr. LEXIS 2207, at *9 (B.A.P. 9th

23   Cir. June 6, 2016) (judgment "amounted to over 98% of his debts"); *In re Huggins*, 380 B.R.

24   75, 81 (Bankr. M.D. Fla. March 28, 2007) ("The [d]ebtor conceded the [judgment] is his only

25   debt); *In re Moss*, 249 B.R. 411, 422 (Bankr. N.D. Tex. 2000) (debt was "99% of the amount

26   of her total debts").

27       Petitioning Creditors' machinations to convert their claims into 100% of KP3's debt are

28   unavailing, as discussed herein, and whatever their protestations, Petitioning Creditors

1   complaints do not amount to a showing fraud, trick, artifice or scam. Courts have found special

2   circumstances where the debtor has engaged in egregious fraudulent transfers or other asset

3   concealment schemes. *See e.g. BDI,* where creditor bank accidentally deposited $7 million in

4   debtor's account, debtor transferred funds to Holland, refused to repay the funds, closed its

5   doors, and started a new company doing the same thing. But no case has found acrimonious

6   business dealings to be special circumstances that justify keeping a company that is generally

7   paying its debts in bankruptcy court.  To the contrary, acrimonious business dealings are a

8   factor that court's look to when dismissing petitions filed by angry or impatient creditors

9   against debtors who are generally paying their debts as they come due. *See Vortex,* 277 F.3d at

10   1072.

11           KP3 submits that the facts as described herein speak for themselves as to the genesis of

12   the dispute between the parties, and further contends that non-payment of a creditor that a

13   debtor is in litigation with is rational ordinary corporate behavior, and not relevant to the

14   inquiry before the Court. The early case of *In re Goldsmith*, 30 B.R. 956 (Bankr. E.D.N.Y.

15   1983) is particularly analogous. In *Goldsmith*, the petitioning creditor, Al's Heating Service,

16   filed an involuntary chapter 11 petition against the alleged debtor, Goldsmith, alleging a debt

17   of $85,734.91 and that the debtor was generally not paying its debts as they come due. Under

18   this earliest version of the Bankruptcy Code, there was no exclusion for debts subject to bona

19   fide dispute, Al's claim exceeded the statutory threshold of $5,000, and there were fewer than

20   12 creditors. The debt to Al's was incurred over a period of 8 years. *Id*. at 957. The alleged

21   debtor testified that it had not paid Al's because it believed it only owed Al's $51,267.15, and

22   the balance was attributable to interest and fees that the debtors argued they did not owe. The

23   alleged debtors explained that they failed to pay Al's the undisputed portion of its claim based

24   on "sound business principles: they do not wish to jeopardize their negotiating posture." *Id*. at

25   958. In particular the court noted their argument that

26               there is no reasonable business man that is going to knuckle down
                 to an inflated demand and say, 'oh, well, I don't really owe you
27               $100,000, I owe you 50, so here is the 50,' and leave himself open
                 for a lawsuit for the hundred. If there is no agreement as to the
28               figure, any reasonable businessman is going to say, 'Look, until

you agree with me as to what I owe you, I am not going to pay you. This is normal business procedure.

*Goldsmith*, 30 B.R. at 958. The Court dismissed the petition, finding that Goldsmith, an operating debtor, clearly had the ability, but not the willingness to pay.

KP3 has not acted in bad faith. Its alleged mistreatment of the Pancheri Creditors does not provide an end-run around the requirement that an involuntary petition can only be granted if an alleged debtor is generally not paying its debts as they come due.

In short, KP3 is solvent and extraordinarily profitable. Even including the claims of Petitioning Creditors that are subject to bona fide dispute, there are no creditors to whom KP3 has regularly defaulted or to whom KP3 has a longstanding default. And there is no threat to KP3's ability to pay Petitioning Creditors' claims if they prevail in an appropriate forum. Here there "is neither a need for a fresh start nor any allegation of inequitable distribution of the alleged debtor's assets." *Goldsmith*, 30 B.R. at 964 (internal citations omitted). Rather, the Pancheri Creditors filed the Petition so that KP3 would be "confronted with the Hobson's choice of either paying a debt [it] does not deem [it]self to owe or be forced into involuntary bankruptcy . . . ." *Id.* Nothing in the record supports the Petitioning Creditors' assertion that KP3 is generally not paying its debts as such debts become due.

## V.    PETITIONING CREDITORS COMMENCED THIS CASE IN BAD FAITH

Even if Petitioning Creditors could carry all of their statutory burdens under Section 303—and they cannot—the Petition should still be dismissed because it was brought in bad faith.

### A.    Legal Standard: Dismissal For Bad Faith

The parties agree that "bad faith provides an independent basis for dismissing an involuntary petition." (Pretrial Statement ¶ 106 (citing *In re Forever Green Athletic Fields, Inc*., 804 F.3d 328, 330, 334 n.5, 335 (3d Cir. 2015), and *In re WLB-RSK Venture*, 296 B.R. 509, 513 (Bankr. C.D. Cal. July 28, 2003)). As explained by the Third Circuit in *In re Forever Green Athletic Fields, Inc*., dismissal on the basis of bad faith is supported by the statutory language of section 303, and "Congress intended for bad faith to serve as a basis for both dismissal and damages." *Forever Green*, 804 F.3d at 334. Where, as here, there are only three

petitioning creditors, the bad faith of a single petitioning creditor is fatal to the petition because it brings the number of petitioning creditors below the 303(b) statutory threshold.  *See id.* at 338 (petition dismissed because one creditor's bad faith "[left] only two good-faith creditors when the statute requires three.")

Courts in the Ninth Circuit examine bad faith using "an objective inquiry into the evidence" to ascertain what a reasonable creditor would have done in the petitioning creditors' circumstances.  *WLB-RSK*, 296 B.R. at 513 (*citing In re Wavelength*, 61 B.R. 614, 620 (B.A.P. 9th Cir. 1986); *C & C Jewelry Mfg. v. Laxmi Jewel Inc. (In re C & C Jewelry Mfg.)*, 373 F. App'x 775, 777 (9th Cir. 2010) (applying objective test).

The bad faith analysis is factually intensive, and in conducting this review courts may consider a number of factors, including, but not limited to, whether:

1.  the filing was used as a substitute for customary debt-collection procedures;
2.  the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same;
3.  the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing;
4.  the filing was used as a tactical advantage in pending actions;
5.  the filing was motivated by ill will or a desire to harass;
6.  the filing had suspicious timing;
7.  there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets;
8.  the creditors satisfied the statutory criteria for filing the petition; and
9.  the involuntary petition was meritorious.

*See In re Forever Green Athletic Fields, Inc.*, 804 F.3d at 336 (collecting cases) (*Forever Green* did not assign each factor a number. The factors have been numbered and reordered for ease of reading).

**B.    There Is Overwhelming Evidence Of Petitioning Creditors' Bad Faith**

The first five factors each provide an independent ground to find bad faith. The final four factors all weigh in the analysis. All nine factors from *Forever Green* overwhelmingly show that the Petition was filed in bad faith.

**i.    The Filing Was A Substitute For A Debt Collection Action**

The paradigmatic example of bad faith is the use an involuntary petition "as a substitute for customary debt collection practices."  *See In re Forever Green Athletic Fields, Inc.*, 804

1  F.3d 328, 336-37 & n.7; *Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.*, 986 F.2d

2  709, 716 n.11 (4th Cir. 1993) ("[d]ebt collection is not a proper purpose of bankruptcy"); *In re*

3  *Nordbrock*, 772 F.2d 397, 400 (8th Cir. 1985) ("A creditor does not have a special need for

4  bankruptcy relief if it can go to state court to collect a debt."); *In re Tichy Elec. Co.*, 332 B.R.

5  364, 374  (Bankr. N.D. Iowa 2005) ("improper use of the Bankruptcy Code as a substitute for

6  customary collection procedures").   It is undisputed that Petitioning Creditors filed this

7  involuntary proceeding as a substitute for debt collection practices, and they have openly

8  admitted that the purpose of the Petition was to get their claims "paid as quickly as possible."

9  This purpose reason enough to find that the petition was filed in bad faith. *In re Tichy*, 332

10  B.R. at 377 (use of involuntary bankruptcy as a collection device "is forbidden").

11      The Petitioning Creditors mince no words in explaining why they filed the Petition:

12  because they believed it was the fastest, most effective way to guarantee payment on their

13  claims against KP3. ███████████████████████████████

14  ████████████████████████████████████████

15  ████████████████████████████████

16  ██████████████

17  ██████████████████

18  ████████████████████████████████████

19  ████████████████████████

20  █  ██████████

21  ██████████████████████████████

22  ████████████████████████████████

23  ████████████████████████

24  █  ██████████

25  ██████████████  is consistent with Tom's, and confirms that the sole purpose for the

26  involuntary is to collect on the debt Petitioning Creditors believe they are owed.  When asked

27  why the Petitioning Creditors opted not to pursue state court litigation or arbitration to recover

28  amounts they claim they are owed, Ryan answered: ██████████████████████████

1 ███████████████████████████████████████████████

2 ███████████████████████████████████████████████

3 ██████████████████

4   ████████████████████████████████████

5 ███████████████████████████████████████████████

6 ██████████████████████████

7       **ii.**      **The Petitioning Creditors Used The Filing To Obtain A**

8       **Disproportionate Advantage For Themselves**

9       Courts will find bad faith "any time a creditor uses an involuntary bankruptcy to obtain

10 a disproportionate advantage to that particular creditor's position rather than to protect against

11 other creditors obtaining such a disproportionate advantage." *In re Better Care, Ltd.,* 97 B.R.

12 405, 411 (Bankr. N.D. Ill. 1989) *accord In re Mi La Sul*, 380 B.R. 546, 557 (Bankr. C.D. Cal.

13 2007) (*quoting Better Care*).

14       Petitioning Creditors evince no concern about protecting their position against other

15 creditors, as they acknowledge KP3 would be able to satisfy a judgment. ████████████████

16 ███████████████████████████████████████████████

17 ███████████████████████████████████████████████

18 █████████████████████████████████████████████Even in defending

19 against the accusation against bad faith, Petitioning Creditors' attribute their need for prompt

20 payment to their own business needs, not to any risk attributable to KP3's financial condition:

21 "[T]the Petition was filed to obtain prompt payment of their claims and so working capital will

22 be available to allow Erik and Ryan to carry on with their new business as they had done

23 before the formation of KP3 in early 2017." (Pretrial Statement ¶ 124 (disputed fact asserted by

24 Petitioning Creditors)).

25       More damning is Petitioning Creditors' admission that they "do not desire that KP3 be

26 liquidated or reorganized." (Pretrial Statement ¶ 118 (undisputed facts)). In other words, they

27 filed the Petition with the sole purpose of collecting cash for themselves. This alone

28 demonstrates bad faith. *In re Grossinger*, 268 B.R. 386, 387 (Bankr. S.D.N.Y. 2001) (bad faith

if intent is to "put a debtor into involuntary bankruptcy, negotiate a settlement and walk away"); *In re Forever Green Athletic Fields, Inc.,* 804 F.3d at 336 (bad faith because creditor was "using the bankruptcy process to exert pressure" to pay judgment ahead of other creditors). It is a bad faith filing when the petition "was an attempt to collect the delinquent funds and not a sincere attempt to liquidate or reorganize this business." *In re Tichy Elec. Co.,* 332 B.R. at 376. As here, the petitioning creditors in *Tichy* "understood that after filing, some negotiations would occur, payments would be made, and the case dismissed." *Id.* [2] Particularly relevant in *Tichy* was a petitioning creditor's email to the alleged debtor that the petition could be dismissed if "payment could be made within 30 days of payment." *Id.* Here, Petitioning Creditors made the same offer to KP3 in a deposition 15 days after the Petition Date. ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Petitioning Creditors had no intention of waiting around for an orderly distribution of KP3's assets. They just calculated that the Petition would give them leverage to get paid as quickly as possible.

### iii.   The Petitioners Did Not Conduct A Reasonable Pre-Filing Inquiry.

Petitioning Creditors' lack of pre-filing diligence constitutes bad faith because it violates the requirement that a petitioning creditor must "reasonably investigate or inquire about the Debtor's financial position" before initiating an involuntary proceeding. *In re Molen Drilling Co.,* 68 B.R. 840, 843-44 (Bankr. D. Mont. 1987); *see also Duran v. Antonini (In re Antonini),* Nos. 09-16850-AJC, 10-03792-AJC, 2012 Bankr. LEXIS 133, at *22-23 (Bankr. S.D. Fla. Jan. 10, 2012) (finding bad faith where "Antonini did not conduct any reasonable due diligence regarding Duran's financial condition prior to filing the Involuntary Petition."); *Atlas*

---

[2] Even if Petitioning Creditors have now figured out some ostensible bankruptcy purpose that might hypothetically apply, it does not fix the problem. *See id.* ("reasons why a hypothetical creditor would use an involuntary Chapter 7 procedure" are irrelevant where petitioning creditors testified that their purpose was collection). *Id.*

*Mach. & Iron Works, Inc. v. Bethlehem Steel Corp*., 986 F.2d 709, 716 (4th Cir. 1993) (bad faith because creditor's prepetition calculation of number of creditors was unreasonable).

The testimony of each of the Petitioning Creditors' representatives confirms that their pre-filing inquiries consisted of nothing more than reviewing the amounts that KP3 purportedly owed to them. █████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

██████████

#### iv.    The Filing Was An Attempt To Gain A Tactical Advantage In The State Court Action.

The use of an involuntary petition to gain a strategic advantage in state court litigation is an improper purpose constituting bad faith.  *See In re Forever Green Athletic Fields, Inc*., 804 F.3d at  337 n.7; *In re WLB-RSK Venture,* 296 B.R. at 515 (dismissing involuntary petition because it was filed "as a litigation tactic"); *In re Silverman*, 230 B.R. 46, 53 (Bankr. D.N.J. 1998) ("Filing an involuntary petition with the intent to gain a strategic advantage . . . constitutes an improper purpose."); *In re Dami*, 172 B.R. 6, 10 (Bankr. E.D. Pa. 1994) ("Where the purpose of the bankruptcy filing is to defeat state court litigation without a [bankruptcy] purpose, bad faith exists.").

Here, REPS attempted to use its filing of the Petition to gain a strategic advantage in the State Court Action, and specifically to assist its President (Erik Pancheri) in his efforts to evade a deposition in that litigation.  Just weeks after the State Court Action was filed, KP3

1   served Erik with a notice of deposition in the State Court Action, seeking to take Erik's

2   deposition on December 11, 2017.  (Neufeld Decl. Ex. BW (Notice of Deposition)).  On

3   December 8, 2017, the last business day before his deposition date, Erik refused to attend the

4   deposition.  (Neufeld Decl. Ex. CZ).  Erik's counsel in the State Court Action, Charlie Hoge,

5   subsequently agreed in writing that Erik would appear for deposition on January 4, 2018.

6   (Neufeld Ex. CX (Dec. 11, 2017 email)).  According to Petitioning Creditors, it was around

7   this time, ("early December 2017") that they first began discussing an involuntary petition with

8   their bankruptcy counsel, Thomas Gorrill.  (Pretrial Statement ¶ 123).  On Friday, December

9   29, 2017, Mr. Hoge reneged on his agreement and stated that Erik was no longer agreeing to

10  appear for deposition on January 4, 2018.  (Neufeld Decl. Ex. BZ.)

11          On January 2, 2018 at 10:21 a.m., KP3 informed Erik's counsel that it would be

12  moving the next day for *ex parte* relief to compel Erik's deposition.  (Neufeld Decl. Ex. DD.)

13  At 5:01 p.m. that same day, after receiving notice of the impending *ex parte* hearing,

14  Petitioning Creditors filed the Petition.  Minutes later, Mr. Hoge filed a "Notice of Automatic

15  Stay" in the State Court Action.  (Neufeld Decl. Ex. CA.)  The next morning, on January 3,

16  2018 at 8:30 a.m., the State Court held a hearing regarding KP3's motion to compel Erik to

17  appear for the deposition.[3] At the hearing, Mr. Hoge argued that the State Court should not

18  consider the motion because the State Court Action was stayed as a result of Petitioning

19  Creditors' filing of the Petition.  (Neufeld Decl. Ex. CE (Jan. 3, 2018 Transcript at 2:19-3:7.)

20  **Tellingly, Mr. Hoge revealed that he had called to inform the State Court of the supposed**

21  **stay *even before the bankruptcy was filed*, confirming that Petitioning Creditors filed the**

22  **Petition with an intention to immediately use the filing to stay the State Court Action**.

23  (Id. at Ex. ____ (Jan. 3, 2018 Tr.) at 2:19-3:7 ("I also called the clerk about 4:30 p.m. yesterday

24  just to alert the clerk that that filing was about to occur.  It didn't actually occur until 5:01 p.m.

25  yesterday.")  Over the following two months, Mr. Hoge would argue repeatedly in the State

26

27  _____
    [3] *See* Trial Exhibit CE.  KP3 requests that the Court take judicial notice of the proceedings in
28  the State Court Action on January 3, 2018 pursuant to the Request for Judicial Notice filed
    concurrently herewith.

1  Court Action that KP3 could not compel Erik's deposition because the filing of the Petition had

2  stayed the State Court Action or otherwise stripped KP3 of standing to pursue its claims

3  against Erik and Ryan.  And while the State Court rejected Mr. Hoge's "stay" argument, Erik

4  still has not appeared for deposition in the State Court Action.

5       Petitioning Creditors predictably argue that their purpose for filing of the Petition was

6  unrelated to any strategic considerations in the State Court Action.  Yet it is beyond dispute

7  that Erik and Ryan have exploited the Petition to provide a tactical advantage in the State Court

8  Action, providing further support for a finding of bad faith.  *See In re Forever Green Athletic*

9  *Fields, Inc*., 804 F.3d at 337 n.7; *In re WLB-RSK Venture*, 296 B.R. at 515.

10           **v.**     **The Filing Was Motivated By Ill Will Towards KP3.**

11       The petitioning creditor's ill will and desire to harass the alleged debtor can also

12  provide an independent basis to find bad faith. *See In re Wavelength, Inc.*, 61 B.R. 614, 620

13  (B.A.P. 9th Cir. 1986) (affirming bad faith determination on the basis of ill will or malice).

14  Here, Petitioning Creditors' ill will and desire to harass is clear. The parties agree that this is an

15  acrimonious fight on both sides. (Pretrial Statement ¶ 5) ("Petitioning Creditors . . . dispute the

16  bad faith assertions and contend the situation is exactly the other way around."). Petitioning

17  Creditors' ill will is also supported by the Pancheri Creditors' baseless suggestions that Robert

18  and John might flee the country, described in subsection ____, below, and their other

19  insinuations about Robert and John's supposed intentions.

20  ██████████████████████████████████

21  ████████████████████████████████████████

22  ██ ██████████████████████████████████

23  ████████████████████████████████████████

24  ████████████████████████████████████████

25  ████████████████████████████████████████

26  ██████████████████████████████████

27       Similarly, BLPT's ill will and desire to harass is demonstrated by its decision to file the

28  Petition as quickly as possible after it believed KP3 had defaulted.  The suspiciously quick

1    filing—on the very same day that KP3's payment was due—foreclosed any possibility that

2    KP3 might pay the TJP Note and thereby prevent the Pancheri Creditors from asserting the

3    debt in an involuntary petition.  The timing suggests that BLPT was not concerned with

4    collecting on its own claim, but with qualifying as a petitioning creditor so that it could punish

5    KP3 and further the interests of REPS, Erik and Ryan.

6                    **vi.    The Filing Had Suspicious Timing**

7            Courts will also consider whether the filing was suspiciously timed. As described in the

8    preceding subsections, the suspicious timing of the filing suggests (i) the Petition was used for

9    tactical advantage in the State Court Action and (ii) that BLPT was not independently

10   motivated to get paid on its own claim but rather to further the interests of REPS, Erik and

11   Ryan.  The joinder of SDCC was also suspiciously timed, given that it occurred well after its

12   claim had been paid.

13                   **vii.    Petitioning Creditors Had No Evidence of Preferential Payments or**

14                          **Dissipation of KP3's Assets.**

15           Petitioning Creditors have provided no evidence of preferential transfers or dissipation

16   of assets, another factor that points toward their bad faith. (*See* Pretrial Statement ¶ 88

17   (undisputed that "[e]xcept for KP3's non-payment of their claims, Petitioning Creditors have

18   not alleged any problem with the nature of KP3's conduct of its financial affairs.").  And KP3

19   could not have made any such transfers as a matter of law because, as Petitioning Creditors

20   concede, "[a]s of the Petition Date and at all relevant times, KP3 was solvent, operating and

21   generating a profit."  (Pretrial Statement ¶ 84; *In re Goldsmith*, 30 B.R. 956, 964 (Bankr.

22   E.D.N.Y. June 22, 1983) ("clearly solvent debtor . . . cannot have made voidable preferences . .

23   . or fraudulent transfers"); *see also In re Wavelength, Inc.*, 61 B.R. 614, 620 (B.A.P. 9th Cir.

24   1986) (finding that alleged debtor "was not insolvent . . . supports the conclusion of bad

25   faith")).

26           Petitioning Creditors never had a good faith belief that there was a risk of asset

27   dissipation. ███████████████████████████████████████████████

28   █████████████████████████████████████████████████████ or otherwise

1   "spirit away KP3's assets (REPS Resp. to KP3 Interrog. No. 12; Trust Resp. to KP3 Interrog.

2   No. 10). █████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████

6   ██████  (REPS Resp. to KP3 Interrog. No. 10; Trust Resp. to KP3 Interrog. No. 8.)  Based on

7   that, they claim to have begun believing there was a flight risk "by January 1, 2018," the day

8   before the Petition Date.  *Id.*  REPS and the Trust also gave similar answers when asked to

9   describe the basis for any belief that there was a risk KP3 might transfer property in exchange

10  for less than reasonably value.  (*See* REPS Resp. to KP3 Interrog. No. 11; Trust Resp. to KP3

11  Interrog. No. 9.).

12      But in their depositions, neither Ryan nor Erik could maintain that Petitioning

13  Creditors' flight risk concerns were serious.  ██████████████████████████████

14  ████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████

19      **viii.    Petitioning    Creditors    Did    Not    Satisfy—And    Knowingly**

20      **Disregarded—The Statutory Criteria For Filing The Petition.**

21      As described in Section ▢ herein, PCs did not satisfy the statutory criteria to become

22  Petitioning Creditors because all three PCs' claims were in bona fide dispute.  The Pancheri

23  Creditors also filed the Petition with an insufficient number of creditors. SDCC's subsequent

24  joinder does not save them.

25      Despite the liberal joinder provisions of the Code, the courts have held "the three

26  creditor requirement is not a meaningless formality that a creditor may ignore until after filing

27  the petition."  *In re Dino's*, 183 B.R. 779, 782 (S.D. Oh. 1995) (internal quotations omitted)

28  (quoting *In re Alta Title Co.,* 55 B.R. 133, 137 (Bankr. D. Utah 1985), quoting *Basin Elec.*

*Power Coop. v. Midwest Proc. Co*., 769 F.2d 483, 486 (8th Cir. 1985)). "In fact, the courts have held 'that an essential prerequisite for allowing joinder of additional creditors to cure a defective petition is that the original petition was filed in good faith, and not as a fraudulent attempt to confer jurisdiction upon the court with a view of being later supported by intervention of other creditors." *Id.* (quoting *Alta*, 55 B.R. at 137). "The ability to force a debtor into bankruptcy in the hands of a single creditor is a very dangerous weapon." *Id.* at 783. "The policy behind the rules requiring three petitioning creditors are: (i) the fear that involuntary bankruptcy might be used by one or two recalcitrant creditors as a means of harassing an honest debtor; and (ii) the possibility that the threat of an involuntary petition would be used to compel the debtor to make preferential payments to one or more litigious creditors." *Id.* (internal quotations omitted) (quoting *In re Earl Sims, Jr.*, 994 F.2d 210, 217 (5th Cir. 1993).)

When the Petition was filed on January 2, 2018, and when it was amended on January 19, there were only two Petitioning Creditors, in contravention of the requirement in Section 303(b)(1). The failure to file with three petitioning creditors reflects Petitioning Creditors' disregard for the statutory criteria of which they were aware. ███████████████████

███████████████████████████████████████████████████████████

███████████████████    ██████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████

Despite having knowledge of both the legal requirement for three petitioning creditors, and also that KP3 had "around 12 creditors" (based on Ryan's intimate personal experience), the Pancheri Creditors made a calculated decision to file the Petition before they could recruit a third petitioner. That is bad faith. *See Basin Elec. Power Coop.*, 769 F.2d  at 486-87

1  (insufficient number of creditors filed a deficient petition when they knew or should have

2  known the alleged debtor had more than twelve creditors); *Atlas Mach. & Iron Works, Inc. v.*

3  *Bethlehem Steel Corp*., 986 F.2d 709, 716 (4th Cir. 1993) (bad faith where creditor's pre-

4  petition investigation unreasonably concluded that debtor had fewer than twelve eligible

5  creditors under the section 303(b) criteria).

6        Having knowingly filed a deficient Petition without consulting any other creditor in

7  advance, the Pancheri Creditors desperately needed a third creditor.  They could only do so by

8  leveraging a personal relationship with a creditor that KP3 had already paid.  SDCC has no

9  economic interest in this case.  ████████████████████████████

10  ████████████████████████████████████████

11  ███████████████████████████████████████Thus,

12  SDCC cannot obtain any benefit as a creditor from joining the Petition but is also protected

13  from any harm through the machinations of the Pancheri Creditors.  That sort of gamesmanship

14  makes a mockery of the section 303(b) requirements.  *Cf.* Fed. R. Bankr. P. 1003(a)

15  (disqualifying entities from commencing an involuntary bankruptcy if they transferred or

16  acquired a claim for the purpose of commencing a case).

17        Even if none of the Petitioning Creditors' claims were in bona fide dispute, the decision

18  to file with two creditors and the gamesmanship surrounding the joinder of SDCC provides a

19  basis to dismiss the Petition on bad faith grounds.

20        In sum, none of the Petitioning Creditors has even attempted to advance a purpose for

21  this bankruptcy other than to pressure KP3 into paying their claims, and all relevant factors

22  support a finding of  This is a textbook bad faith involuntary petition.

23        **C.**     **The Petition Has Damaged KP3.**

24        The Petition has already done significant damage to KP3's business.  In a Google

25  search for KP3 Endeavors, several of the first hits are related to this involuntary bankruptcy

26  case.  The ramifications are already being felt.  KP3 is actively hiring employees as it seeks to

27  build on its strong growth, but potential candidates may be reluctant to join under the specter of

28  bankruptcy.  Other candidates may have decided not to contact KP3 at all.  The harm to hiring

1    is particularly acute because Erik and Ryan used their time at KP3 to poach more than half of

2    KP3's employees to work at their current venture. (Karr Decl. ¶29.)

3          KP3's sources of new credit have also tightened.  KP3 requires additional working

4    capital to purchase additional ticket inventory for resale.  The pending bankruptcy has stymied

5    KP3's ability to obtain additional credit, and at least one lender has specifically identified the

6    bankruptcy as the sole basis for refusing to lend.  Without working capital, KP3 loses the

7    opportunity to purchase tickets before the most popular events sell out, to a significant

8    financial loss of opportunity for KP3. (Karr Decl. ¶30.)

9          Several of KP3's significant vendors, including its landlord and Broker Genius, have

10   called to discuss KP3's financial health and required assurances that it was continuing to

11   operate without disruption.  KP3 may also have suffered other harms from publicly being in

12   bankruptcy for more than three months—it has not yet attempted to quantify them all. (Karr

13   Declaration ¶31.)

14   **VI.    PETITIONING CREDITORS CANNOT MEET THEIR BURDEN TO SHOW
            THAT THEIR CLAIMS ARE NOT IN BONA FIDE DISPUTE AS TO
15          LIABILITY AND AMOUNT**

16         The Petition should be dismissed under section 303 of the Bankruptcy Code because

17   Petitioning Creditors cannot meet their burden to prove that their claims are not in bona fide

18   dispute as to liability and amount.

19         Section 303(b)(1) provides, in pertinent part, as follows:

20             (b) An involuntary case against a person is commenced by the filing with the
               bankruptcy court of a petition under chapter 7 or 11 of this title–
21

22             (1) by three or more entities, each of which is either a holder of a claim against
                   such a person that is not contingent as to liability, or the subject of a bona
23                 fide dispute as to liability or amount . . . if such noncontingent, undisputed
                   claims aggregate at least $15,775 more than the value of any lien on
24                 property of the debtor securing such claims held by the holders of such
                   claims;
25             (2) if there are fewer than 12 such holders, excluding any employee or insider
26                 of such person and any transferee of a transfer that is voidable . . ., by one or
                   more of such holders that hold in the aggregate at least $15,775 of such
27                 claims.

28

1

2    11 U.S.C. § 303(b).

3        On February 14, 2018, KP3 filed the Creditor List showing approximately 60 creditors

4    holding claims against KP3 (Dkt. 29). Petitioning Creditors raised informal objections to some

5    of the creditors on the list, but ultimately conceded that KP3 had at least twelve qualifying

6    creditors on the Petition Date. Neufeld Declaration ¶____. ████████████████████

7    ████████████████████████████████████████████████████

8    █████████████████████████████████ Accordingly, in the Pretrial Statement,

9    the Petitioning Creditors did not raise a challenge the existence of at least twelve qualifying

10   creditors.  Because KP3 had more than twelve qualifying creditors on the Petition Date, under

11   Section 303(b), the Petition must be dismissed unless there are at least three petitioning

12   creditors whose claims are not subject to bona fide dispute.

13       To determine whether a claim is in bona fide dispute, the Ninth Circuit Court of

14   Appeals employs the "objective test" adopted by the majority of circuits that considers

15   "whether there is an objective basis for either a factual or legal dispute as to the validity of the

16   debt." *Vortex*, 277 F.3d at 1064 (quoting *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987)).

17   Under the objective test, "[i]f there is either a genuine issue of material fact that bears upon the

18   debtor's liability, or a meritorious contention as to the application of law to undisputed facts,

19   then the petition must be dismissed." *Id.* (citations omitted). In *In re O'Neil*, No. 04-09162-

20   JM7, 2006 Bankr. LEXIS 4704 (Bankr. S.D. Cal. Dec. 19, 2006), Judge Myers explained that

21   the bona fide dispute requirement in section 303(b)(1) disqualifies a creditor whenever there is

22   "any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal,"

23   because Congress did not intend to require a debtor to pay a legitimately disputed debt simply

24   to avoid the stigma of bankruptcy. *Id.*at *3.

25       In applying the objective test, courts in the Ninth Circuit, and throughout the country,

26   generally employ a burden-shifting framework for the establishment of the existence or

27   absence of a bone fide dispute as to liability or amount. *See, e.g.*, *Laxmi Jewel Inc. v. C&C

28   Jewelry Mfg., Inc. (In re C&C Jewelry Mfg., Inc.)*, Nos. CC-08-41190-HMoMk, CC-09-1267-

HMoMk, 2009 Bankr. LEXIS 4517 (B.A.P. 9th Cir. April 14, 2009); *In re Marciano*, 446 B.R. 407, 422 (Bankr. C.D. Cal. 2010), *aff'd Marciano v. Fahs (In re Marciano)*, 459 B.R. 27 (B.A.P. 9th Cir. 2011) (citation omitted). Under the burden-shifting framework, a petitioning creditor must establish a prima facie case that no bona fide dispute exists. *Marciano*, 446 B.R. at 422. In *Marciano*, for example, the petitioning creditors met that burden by showing that they had an unstayed judgment against the alleged debtor. *Id.* If the petitioning creditor fails to meet that burden, the petition must be dismissed for lax of standing.   Once a petitioning creditor has met its prima facie burden, the burden shifts to the debtor to present evidence demonstrating that a bone fide dispute does exist.  *Id.*

But the ultimate burden to prove the absence of a dispute remains on the petitioning creditor. *Liberty Tool v. Vortex Fishing Sys. (In re Vortex Fishing Sys.)*, 277 F.3d 1057 (9th Cir. 2001) (internal citation omitted); *In re O'Neil*, No. 04-09162-JM7, 2006 Bankr. LEXIS 4704, *3 (Bankr. S.D. Cal. Dec. 19, 2006).   A creditor asserting contract claims not yet reduced to judgment must show that there is no material legal or factual dispute as to the validity or amount of the debt. *Mont. Dep't of Revenue v. Blixseth*, No. 2:13-1324-JAD, 2017 U.S. Dist. LEXIS 206513 (D. Nev. Dec. 15, 2017).

Here, the parties agree that "the material circumstances leading to the commencement of this case concern a dispute between KP3's present and former directors." Pretrial Statement ¶19. The documents evidencing the terms of the parties arrangements and disagreements have been submitted into evidence by KP3. Related claims have been brought, and will be brought, in the State Court Action or in arbitration, the bargained for forum under the Purchase Agreement. In light of the ongoing acrimony, none of Petitioning Creditors' claims can be ascertained with any specificity.  As one court noted, had Petitioning Creditors submitted these claims with a proof of claim, their claims would surely have drawn an objection and necessitated a trial. *See In re Mt. Dairies, Inc.*, 372 B.R. 623 (Bankr. S.D.N.Y. 2007); *see also Crest One SpA v. TPG Troy, LLC (In re TPG Troy, LLC)*, 793 F.3d 228, 231 (2d Cir. 2015) ("plethora of ongoing litigation that involves same nucleus of facts speaks strongly to the likelihood that there is a bona fide dispute"). As demonstrated below, Petitioning Creditors

1   cannot show that their claims are not subject to bona fide dispute as to liability or amount and

2   therefore this proceeding should be dismissed.

3       **A.**    **SDCC's Claims Are Subject To Bona Fide Dispute As To Liability And**

4              **Amount.**

5         Petitioning Creditor SDCC is a computer consulting company located in San Diego,

6   California. On March 2, 2018, creditor SDCC joined (Dkt. 34, the "Joinder") the Petition

7   alleging that it had a claim for $1,161.00 as of the Petition Date, of which $387.00 was more

8   than 60 days' past due.  The Joinder was signed by Glen Jaffe, SDCC's owner. It is undisputed

9   that as of the date of the Joinder, SDCC had been paid in full. (Glen Depo. Tr. 41:4-23)

10         SDCC's claims are subject to bona fide dispute as to liability and amount.  KP3 had no

11   liability to SDCC on the Petition Date because KP3 timely tendered payment of its invoices to

12   SDCC in the manner required by SDCC and SDCC had failed to collect its payment, relieving

13   KP3 of liability.  California's Civil Code provides: "If a creditor . . . at any time directs the

14   debtor to perform his obligation in a particular manner, the obligation is extinguished by

15   performance in that manner, even though the creditor does not receive the benefit of such

16   performance."  Cal. Civ. Code § 1476.  SDCC's credit card authorization form provides, "this

17   form is required for all new and existing customers."  Trial Exhibit AK.  SDCC required

18   payment by credit card.  On or about November 8, 2017, Robert Karr authorized Glen to

19   charge a new credit card number to pay an open invoice, and to place that credit card on file to

20   automatically pay all future invoices.  Karr Declaration ¶32. Glen charged the card and the

21   charge went through. *Id.* KP3 authorized Glen to charge that card for future invoices. *Id.*  KP3

22   performed in the manner required by tendering a credit card with ample available credit and an

23   expiration date far into the future. *Id.* SDCC issued invoices to KP3 on or about December 1,

24   2017 and January 2, 2018, but failed to charge the credit card on account, thus extinguishing

25   KP3's liability therefore whenever it arose.  Cal. Civ. Code § 1476.  Accordingly, SDCC had

26   no claim on the Petition Date.

27         Even if SDCC had some right to payment on the Petition Date, the amount of its claim

28   is in dispute.  On March 2, SDCC filed its Joinder, two months after the Petition Date,

1   asserting a claim for $1,161, of which $387 is alleged to be 60 days past due. Dkt. 34. ██

2   ████████████████████████████████████████████████████████████████████

3   █████████████████████████████████████████████ KP3 disputed the contention.

4   ████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████

7   ██████████████████████████ On March 22, 2018, Mr. Jaffe submitted an errata sheet

8   to his deposition, correcting his testimony to state that the amount due to SDCC on the Petition

9   Date is $774. Trial Exhibit AQ.  Accordingly, SDCC appears now to be claiming that $774

10  was due on the Petition Date.  It is unclear whether SDCC still claims that $387 was more than

11  60 days past due – presumably it does not.  **Moreover, SDCC has yet to correct the Joinder it**

12  **filed with the Court, in which Mr. Jaffe declared under penalty of perjury that KP3 owed**

13  **$1,161 as of the Petition Date.**

14        Even after the "correction," Glen's testimony remains incorrect. On January 2, 2018,

15  SDCC's December invoice was unpaid, but its January invoice was not due. Trial Exhibit AK,

16  pg 4. In other words, KP3 owed at most, half of what SDCC asserts it is due on the Petition

17  Date, after its correction. Nor has SDCC provided any evidence to support its contention that

18  $387 was more than sixty days past due on the Petition Date. SDCC cannot meet even the

19  minimal burden to prima facie demonstrate its *de minimus* claim. *See In re ELRS Loss*

20  *Mitigation, LLC*, 325 B.R. 604, 628 (Bankr. N.D. Okla. 2005) (determining claim filed by

21  ostensible third-party creditor was subject to bona fide dispute where, "[h]e admits that he has

22  no idea what he might be owed and relies solely upon the calculations supplied to him by [the

23  former insider petitioning creditor]); *see In re Guerra*, Case No. 13-51100, 2014 Bankr. LEXIS

24  580 (Bankr. N.D. Cal. Feb. 11, 2014) (petitioning creditor's own conflicting statements give

25  rise to the bona fide dispute).  SDCC has the burden to prove the liability and amount of its

26  claim and it has not met its burden. *Mont. Dep't of Revenue v. Blixseth*, No. 2:13-1324-JAD,

27  2017 U.S. Dist. LEXIS 206513 (D. Nev. Dec. 15, 2017). Without SDCC, Petitioning Creditors

28  are back to only two petitioning creditors and this Petition should be dismissed.

**B.**     **The Claims Of REPS And BLPT Are Part Of A Single Transaction To Form KP3, And Petitioners' Bad Acts Place These Claims In Dispute.**

As described in Sections VI.C through VI.E below, the claims asserted by REPS and the BLPT are subject to bona fide dispute on a number of factual and legal grounds. Each claim asserted by REPS and the BLPT is also in bona fide dispute as a result of the bad acts alleged by KP3 in the State Court Action. These bad acts are described in Section III.C, and include egregious misconduct and breaches of contractual and fiduciary obligations by Erik, Ryan and Tom Pancheri. *See supra*, Sec. III.C. Attempting to brush aside these inconvenient facts, Petitioning Creditors urge the Court to view their own claims against KP3 in a vacuum, and ignore the context in which those claims arise. Pretrial Statement ¶¶63-65. But because each of the claims asserted by REPS and BLPT arise from agreements relating to the same subject-matter and for the same purpose as the claims raised by KP3 in the State Court Action—*i.e.*, the formation of KP3—California law requires that they be considered as one transaction. The fact that Petitioning Creditors and their representatives have materially breached their obligations under the common transaction can therefore be raised by KP3 as a defense to Petitioning Creditors' attempt to compel KP3 to perform its purported obligations under the common transaction.

Under California law: "'It is a general rule that several papers relating to the same subject-matter and executed as parts of substantially one transaction, are to be construed together as one contract." *Holguin v. Dish Network LLC*, 229 Cal. App. 4th 1310, 1320 (2014) (quoting *Symonds v. Sherman*, 219 Cal. 249, 253 (1933)). This rule is established both by the case law and also by statute, in Civil Code § 1642: "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." The rule is flexible, and "has been stated in varying ways" depending on the particular facts at hand. *Harm v. Frasher*, 181 Cal. App. 2d 405, 412 (1960). For example, it is not necessary that the agreements expressly reference one another if it "appears from extrinsic evidence that they were executed as a part of one transaction." *Id.* at 413-14 ("The use of extrinsic evidence to lay the foundation for a consideration of several instruments as part

of a single transaction does not involve a violation of the parol evidence rule.")  The rule is also applicable "whether each of the several instruments was signed by all or only by some of the parties to the transaction.  *Id.* (citing *Mayers v. Loew's Inc*., 35 Cal. 2d 822 (1950)).  Likewise, the rule will apply "to agreements executed by the parties at different times if the later document is in fact a part of the same transaction.'" *Versaci v. Superior Court*, 127 Cal.App.4th 805, 814 (2005) (applying Cal. Civ. Code § 1642).

Here, the formation of KP3 in early 2017 constituted a "single transaction" such that the "several papers relating to the subject-matter . . . are to be construed together as one contract."  *See Holguin*, 229 Cal. App. 4th at 1320.  Petitioning Creditors' own testimony confirms that the claims they are asserting against KP3—under the TJP Note, the REPS LOC, and the REPS Purchase Agreement—were all part of a common transaction for the formation of KP3. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Petitioning Creditors' interrogatory responses are consistent with this testimony, and state that the REPS LOC and TJP Note were extended to KP3 "in connection with the formation of the business in January 2017."  (Trial Exhibit AM (REPS Rog. Response) at No. 4; Trial Exhibit AL(BLPT Rog. Response) at No. 3 ("relative to the formation of KP3").)

Critically, the bad acts carried out by Erik, Ryan and Tom included breaches of other papers within the common transaction to form KP3.  *See supra*, Sec. III.C.  Specifically, and as alleged in KP3's State Court Action, this conduct breached Erik and Ryan's obligations under their Employment Agreements with KP3 to devote their "full time, attention and effort to the performance" of their duties for KP3, and to " render Ticket Marketing Services exclusively for and on behalf of" KP3.  (Karr Declaration Exs. BN, BO (Employment Agreements) at §§ 2.1-2.2.)  Those Employment Agreements—like the REPS LOC,TJP Note, and REPS Purchase

Agreement—were integral to the formation of KP3.  Based on the Petitioners' bad acts and breaches of the common transaction, KP3 will raise defenses to the claims asserted by BLPT and REPS as follows.

### i.    KP3's Unclean Hands Defenses[9]

The doctrine of unclean hands provides that "inequitable conduct by the plaintiff in connection with the matter in controversy … provides a complete defense to the plaintiff's action."  *Dickson, Carlson & Campillo v. Pole*, 83 Cal. App. 4th 436, 446 (2000).  A leading California decision describes unclean hands as follows:

> "The doctrine promotes justice by making a plaintiff answer for its own misconduct in the action.  It prevents "a wrongdoer from enjoying the fruits of his transgression . . . "a plaintiff [must] act fairly in the matter for which he seeks a remedy.  He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim."

*Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978-79 (1999).  Ultimately, the unclean hands doctrine "is an equitable rationale for refusing a plaintiff relief where principles of fairness dictate that the plaintiff should not recover, regardless of the merits of his claim. It is available to protect the court from having its powers used to bring about an inequitable result in the litigation before it."  *Id.* at 985 (citing *Ford v. Buffalo Eagle Colliery Co.*, 122 F.2d 555, 563 (4th Cir. 1941)).

In this case, the bad acts of Erik, Ryan and Tom can and should be imputed to BLPT and REPS for purposes of the unclean hands defense.  The evidence adduced in this proceeding confirms that REPS played a role in Erik and Ryan's bad acts, including by supplying credit cards that were used by Erik and Ryan—with the assistance of KP3's own employees—for the new company. ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████     ███████████████████████

████████████████████████████████████████████████████████████

---

[9] Bankruptcy courts recognize unclean hands as a defense giving rise to a bona fide dispute to contract claims.  *See, e.g.*, *In re C&C Dev. Grp., LLC*, NO. 11-32362-BKC-AJC, 2012 Bankr. LEXIS 2269, *5-6 (Bankr. S.D. Fla. May 21, 2012).

1    ███████████████████████████████████████████    Likewise, the bad acts can be

2    imputed to the BLPT given Tom is both (1) an investment advisor to the BLPT and participant

3    in negotiation and execution of the TJP Note, and (2) a direct participant in the unlawful

4    conduct at issue in the State Court Action.

5        A similar issue was addressed in *Peregrine Funding, Inc. v. Sheppard Mullin Richter &*

6    *Hampton LLP,* in which a corporate officer's bad acts were imputed to the corporation in a

7    "classic case for the unclean hands defense." 133 Cal. App. 4th 658, 679-682 (2005).   In

8    *Peregrine Funding*, the plaintiff corporation argued that the unclean hands defense did not

9    apply because the fraudulent acts of its former controlling officer could not be imputed to the

10   corporation.  Based on defendant's allegations that the plaintiff corporation was "controlled

11   by" the former officer at the time he committed the fraud, the *Peregrine* court found that the

12   "fraud is properly imputed" to the corporation for purposes of the unclean hands doctrine. *Id.*

13   at 680.  As in *Peregrine*, REPS was "controlled by" Erik and Ryan, ████████████████

14   ███████████████████████████████████████████████████████████████████████

15   ██████████

16       Erik, Ryan and Tom's bad acts are also an appropriate basis for the unclean hands

17   defense because they "relate to" to the subject matter of BLPT's and REPS' claims against

18   KP3.  California courts take a broad view of whether a plaintiff's inequitable conduct relates to

19   "the transaction concerning which the complaint is made," and will look generally to the

20   "subject matter involved and not whether it is part of the basis upon which liability is being

21   asserted."  *Peregrine Funding, LLP*, 133 Cal. App. 4th at 681.  In other words, BLPT and

22   REPS cannot avoid the unclean hands doctrine by narrowly focusing their claims on those

23   aspects of the common transaction that pertain to KP3's payment obligations, while ignoring

24   the parties' other objectives and purposes for the formation of KP3.  *See Kendall-Jackson*, 76

25   Cal. App. 4th at 985 ("*Any evidence* of a plaintiff's unclean hands in relation to the transaction

26   before the court or which affects the equitable relations between the litigants in the matter

27   before the court should be available to enable the court to effect a fair result in the litigation.")

28   (emphasis added).  The bad acts of Erik, Ryan and Tom undeniably "infect[ed] the cause of

1    action involved and affect[ed] the equitable relations between the litigants." *Kendall-Jackson*,

2    76 Cal. App. 4th at 984.

3                    **ii.    KP3's Material Breach Defense**

4             "When a party's failure to perform a contractual obligation constitutes a material

5    breach of the contract, the other party may be discharged from its duty to perform under the

6    contract . . . A material breach of one aspect of a contract generally constitutes a material

7    breach of the whole contract." *Brown v. Grimes*, 192 Cal. App. 4th 265, 277–278 (2011); *see*

8    *also Consolidated World Investments, Inc., v. Lido Preferred Ltd.* 9 Cal.App.4th 373, 380

9    (1992) ("It is elementary a plaintiff suing for breach of contract must prove it has performed all

10   conditions on its part or that it was excused from performance.").

11            The bad acts by Erik, Ryan and Tom were a material breach of obligations owed under

12   the Employment Agreements.  Because the Employment Agreements were part of the same

13   "single transaction" to form KP3 that also gave rise to the agreements (and claims) now

14   asserted by Petitioning Creditors, the material breaches are a defense to KP3's performance

15   obligations under those related agreements.  *Holguin,* 229 Cal. App. 4th at 1320 ("[S]everal

16   papers relating to the same subject-matter and executed as parts of substantially one

17   transaction, are to be construed together as one contract.").

18                    **iii.    KP3's Implied Covenant Of Good Faith And Fair Dealing Defense**

19            "There is implied in every contract a covenant by each party not to do anything which

20   will deprive the other parties thereto of the benefits of the contract.  This covenant not only

21   imposes upon each contracting party the duty to refrain from doing anything which would

22   render performance of the contract impossible by any act of his own, ***but also the duty to do***

23   ***everything that the contract presupposes that he will do to accomplish its purpose***."

24   *Floystrup v. City of Berkeley Rent Stabilization Bd*., 219 Cal. App. 3d 1309, 1318 (1990)

25   (citations omitted, emphasis added). California courts acknowledge the availability of the

26   implied covenant as an affirmative defense. *See Wri Golden State v. Liu*, 2012 Cal. App.

27   Unpub. LEXIS 5696, *10, n.3 (Aug. 1, 2012) (acknowledging that breach of the implied

28

covenant can be raised as affirmative defense); *Santa Fe Braun v. Ins. Co. of N. Am.*, No. CGC-04-428686, 2012 Cal. Super. LEXIS 306 (Oct. 26, 2012) (same).

In their dual roles as officers and directors of both REPS and of KP3, Erik and Ryan were invested with "discretionary power" because it was uniquely within the control of Erik and Ryan to provide—or withhold—their time and efforts from KP3's business, and it was their time and efforts that KP3 viewed as the primary purpose and benefit of the Purchase Agreement.  Erik and Ryan did not exercise this power in good faith but made a decision to abandon their management responsibilities, and to use KP3's resources to build a competing enterprise, among other things.  Relevant to this case, California courts have granted relief under the implied covenant where the litigants did not have express contractual obligations to one another, but were instead parties to a "single transaction."  *See Harm*, 181 Cal. App. 2d at 416-17 (finding that all parties to a "single transaction" owed duties to one another under the implied covenant of good faith and fair dealing).  At minimum, there are issues of fact regarding whether and to what extent Erik and Ryan were acting as agents of REPS when they committed acts that deprived KP3 of its anticipated benefits under the Purchase Agreement, and these issues must be litigated in the proper forum. In *Vortex*, the Ninth Circuit held that equitable defenses to contract claims (such as impossibility) give rise to bona fide disputes for purposes of section 303 of the Bankruptcy Code. 277 F.3d at 1067.

### C.    BLPT's Claim Is Subject To Bona Fide Dispute.

Petitioning creditor BLPT asserts a claim against KP3 for $1,000,000 as assignee from the Thomas J. Pancheri Trust.  (Dkt. No. 6, at 3).  In February of 2017, Thomas J. Pancheri advanced $1 million to KP3, which was repaid, with interest, in July of 2017. (Pretrial Statement at ¶ 58.)  On March 1, 2017, Thomas J. Pancheri advanced a second $1,000,000 to KP3 (the "TJP Loan").  (*Id.*)  The TJP Loan is evidenced by a document entitled Promissory Note (Optional Advance Note) and dated March 1, 2017 (the "TJP Note").  (*Id.*)  The TJP Note was signed by Robert on behalf of KP3, and made payable to the Thomas J. Pancheri Trust as payee.  (*Id.*)  The TJP Note provided for payment of interest at 8% per annum to be paid quarterly, and a maturity of principal and interest on December 31, 2017.  (*Id.*)  From March 1,

1    2017 through May 2017, KP3 paid Tom interest on the TJP Loan monthly.  (Pretrial Statement

2    ¶ 59.)

3    In June of 2017, Tom instructed Robert to make further interest and principal payments

4    to his ex-wife Bonnie Pancheri ("Bonnie").[10]  (Trial Ex. AL at Rog. Response No. 16.)  From

5    June 2017 through the Petition Date, KP3 paid Bonnie monthly interest on the TJP Note.

6    (Pretrial Statement ¶ 59.)  On Thursday, December 28, 2017, Bonnie sent an email to Robert

7    and John stating "Hi, Here is my wiring information for the loan repayment" and providing

8    wire information for an account at Bank of America. Trial Ex. 3.  The TJP Note matured on

9    December 31, 2017, but payment was not due until January 2, 2018, *see* Cal. Civ. Code §§7,

10   11, and was not overdue until January 3, 2018.  *See* C-U.C.C. § 3304(b)(2).  Petitioning

11   Creditors filed the Petition one minute past 5:00 p.m. on January 2, 2018.

12   Petitioning Creditors will likely argue that the TJP Note is a negotiable instrument

13   governed by the California U.C.C., and BLPT is a holder in due course entitled to enforce the

14   instrument. KP3 disputes that conclusion, and it must fail, because BLPT cannot satisfy the

15   requisite elements under the U.C.C. and section 303 of the Bankruptcy Code.

16   **i.    BLPT Has Not Established A Prima Facie Right To Payment Under**

17   **The Note, Including As To Whether It Is A Holder Of The Note.**

18   To complete the first phase of the burden-shifting analysis, BLPT must prove the prima

19   facie validity and amount of its claim. Under the section 101(5) of the Bankruptcy Code, a

20   claim is a right to payment. A putative claimholder's right to payment generally will be

21   determined under applicable non-bankruptcy law. Here, the applicable law is California law.

22   Petitioning Creditors allege that the TJP Note is a negotiable instrument. Negotiable

23   instruments are governed by article 3 of the California U.C.C. (If the TJP Note is not a

24   negotiable instrument it will be evaluated under normal California contract law principles).

25   Under the C- U.C.C., the entity with the right to payment is the holder.  U.C.C. 1-201. To be a

26   holder, the creditor must be in possession of the Note. *See* U.C.C. 1-201. BLPT cannot meet its

27   prima facie burden to show a claim against the debtor, because BLPT failed to demonstrate

28

---

[10]  Bonnie is Erik and Ryan's mother and John's aunt, and was an insider of KP3 at least
through October 2017.

that it is in possession of the TJP Note. BLPT has never asserted that it was in possession of the TJP Note and the evidence in the record is to the contrary. Accordingly, there is a bona fide dispute as to whether BLPT is a holder entitled to enforce the TJP Note. *See Veal v. Am. Home. Mortg. Servicing, Inc. (In re Veal),* 450 B.R. 897 (B.A.P 9th Cir. 2011).

BLPT, through Tom, argues that the TJP Note was assigned to BLPT in April 2017. As evidence, BLPT offers a copy of the TJP Note with a purported assignment attached, dated as of April 1, 2017 (the "Assignment"). TJP never provided a copy of the TJP Note with Assignment attached to KP3, or even just the Assignment. Although the Assignment is dated as of April 1, 2017, Tom did not disclose the transfer to KP3 until the end of June. Trial Exhibit AL (BLPT Rog. Response) at No. 16.  Accordingly, KP3 continued to pay interest to Tom through June.  Pretrial Statement ¶ 59.  Bonnie, the purported trustee of BLPT, did not contact KP3 to set up payment, or inquire about the interest payments that were paid between April and June. BLPT never sent KP3 any correspondence. KP3 made monthly interest payments to Bonnie, in her personal capacity.

KP3 first saw the Assignment when a copy was produced by Mr. Gorrill hours before Tom was scheduled to testify in this proceeding as the person most knowledgeable about BLPT's claim.  When the Petition was filed, the TJP Note and Assignment were not attached, and the box on the Petition asking whether any petitioning creditor's claim was the result of an assignment was not marked. (Dkt. No. 1, Sec. 12.)  Petitioning Creditors amended the Petition to identify the transfer and attached the TJP Note with Assignment in mid-January, after Tom's deposition.  (Dkt. No. 6)

BLPT may argue that Mr. Gorrill's production of the Assignment constitutes evidence that the TJP Note was in BLPT's possession. But, Mr. Gorrill's production only evidences that Mr. Gorrill came into possession of the copy at some point, likely well after the Petition Date, given that the assignment was neither noted on the Petition nor attached. Given that Mr. Gorrill represents both Tom and BLPT, the production does not demonstrate that the Assignment was in BLPT's possession on the Petition Date, particularly where it was neither mentioned nor attached to the Petition. Other than the production by Mr. Gorrill, there is no other evidence

that the TJP Note was ever transferred to BLPT.  Bonnie, the purported trustee of BLPT, has not offered testimony in these proceedings. KP3 issued requests for production of all documents evidencing BLPT's claim, but no documents, other than the emailed copy of the Assignment were ever produced. BLPT objected to production on the grounds of privacy, Trial Exhibit AL (BLPT Rog. Response) at No. 26 ("to the extent they are not otherwise private."), even though an order of protection was entered and even though it also argued that the documents were publicly available from the family court. *Id.*  Despite numerous requests, BLPT insisted that all relevant documents had been produced.  If no other evidence exists, then there is no evidence that the TJP Note was ever in BLPT's possession.

BLPT, through Tom, may argue that it was in possession because Tom retained the TJP Note on BLPT's behalf, as agent. Tom's assertion that he is the agent for his ex-wife's marital trust beguiles, particularly when unsupported by even a scintilla of corroborating evidence. ██████████████████████████████████████████████████ When asked why he was providing testimony on behalf of BLPT's claim, he answered that he was testifying because he was there when the loan was made, not because he was acting as BLPT's agent. (*Id.* at 15:7-11.) When asked whether he had other roles vis-à-vis BLPT, Tom testified that he "handles investment of her money." (*Id.* at 15:12-14). When asked how long that arrangement has been in place, Tom answered, "since its inception," but when asked when that was, he said he did not recall. *Id.*  at 15:7-8. ██████████████████ ████████████████████ ████████████████████ ████████████████████████████████████████████ The evidence of Tom's role vis-a-vis the trust is ambiguous at best. BLPT cannot meet its prima facie burden to prove the validity of its claim on an empty evidentiary record and in light of Tom's lack of candor.

**ii.      Even if BLPT Is A Holder, There Is A Genuine Dispute Of Material Fact That It Is A Holder In Due Course.**

Even if BLPT could meet its prima facie burden to show that it is a holder entitled to enforce the note under U.C.C. § 3301, there is a genuine dispute of material fact as to BLPT's rights as a putative holder in due course.

Under the U.C.C., had Tom sought to enforce the TJP Note on his own behalf, he could have, but his claim would be subject to KP3's defenses against him. See C-U.C.C. § 3305(a)(2) ("Except as stated in subdivision (b), the right to enforce the obligation of a party to pay an instrument is subject to all of the following:. . .(2)  . . .a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract."). Petitioning Creditors argue that the "alleged harm caused by Tom has never been articulated or explained by KP3 at any time." (Pretrial Statement ¶ 62.) It is unclear when would have been the right time to articulate or explain Tom's actions, to Tom, who is, of course, most aware of his role in the events described herein, that led to the termination of his sons' employment from KP3 mere months after KP3 was formed and the commencement of the State Court Action. Notably, contract defenses are not enforceable against holders in due course. C-U.C.C. § 3305(b).

For protection against Tom's bad acts being imputed to the holder, BLPT will likely argue that it is a holder in due course. Under U.C.C. § 3302, a holder in due course takes (a) for value, (b) in good faith, (c) without notice that the (i) instrument is overdue or has been dishonored or there is an uncured default, (ii) instrument has been altered, (iii) of any claim under U.C.C. § 3306 (the rights of a person that is not a holder in due course); and (iv) without notice that any party has a defense or claim in recoupment. Yet, BLPT has averred no facts tending to support this conclusion, other than ███████████████████████████ ████████████████████████████████████████████████ ███████████████        No evidence was provided about the circumstances under which Bonnie allegedly accepted a note, but Tom accepted payment in full in cash.

If BLPT is a holder, whether BLPT is a holder in due course materially alters its rights under section 3305, because, as stated above, a holder in due course takes free of ordinary contract defenses, while a holder not in due course does not. The factual disputes about whether value was given give rise to a bona fide dispute.

BLPT argues that there is no legitimate dispute because whether the TJP Note was assigned to Bonnie, as Tom said in June, or BLPT, as stated on the Petition, makes no difference because Bonnie is BLPT's trustee. Of course, no evidence was submitted to prove that Bonnie was BLPT's trustee, or that BLPT exists at all. The burden of proof is on BLPT, and it has failed to meet even its prima facie burden.

Moreover, under the U.C.C. an obligor who pays the wrong payee bears the risk.  *See, e.g.*, *Jackson v. 2109 Brandywine,* 180 Md. App. 535 (Md. Ct. Sp. Appls. 2008) (collecting cases)*; Equity Bank v. Gonsalves*, 44 Conn. Supp. 464, 691 A.2d 1143, 1145-46 (Conn. Sup. Ct. 1996) ("The rule as to the payment and discharge of negotiable instruments is that the payment of the bill or note must be made to the rightful holder or his authorized agent. . . . Paying the wrong party does not discharge a negotiable note") (citations omitted); *Madison-Hunnewell Bank v. Hurt*, 903 S.W.2d 175, 179 (Mo. App. 1995) ("The rule is that the payor of a note exposes himself to double liability if he delivers his payment to someone other than the holder.")

"However, there is an exception to the rule: if the payor can show that the one to whom he paid the money stood in the position of agent to the owner of the note, he is entitled to the benefit of payment." *Madison-Hunnewell Bank*, 903 S.W.2d at 179; *see also Manufacturers & Traders Trust Co. v. Korngold*, 162 Misc. 2d 669, 618 N.Y.S.2d 744 (N.Y. Sup. 1994) ("Inasmuch as payment to an agent who has neither possession of the note and mortgage nor express authority to receive payment does not relieve the mortgagor of the obligation to make payment to the mortgagee, a mortgagor making payment to an agent who fails to provide any evidence of its authority does so at his peril.") (citation omitted); *Lambert v. Barker*, 232 Va. 21, 348 S.E.2d 214, 216, 3 Va. Law Rep. 462 (Va. 1986) ("[T]he burden of proving an agency relationship rests on the party claiming payment as a defense. One making payment to an agent

1    has the burden of showing that the agent has either express or apparent authority to receive

2    such payment upon behalf of his principal, and the evidence to that effect must be clear and

3    convincing. If payment is made to a party who does not have in hand the obligation, the debtor

4    takes the risk of such party having the authority to make collection.") (citation omitted); *see

5    also* 59 C.J.S. Mortgages § 453 (2007).

6        Petitioning Creditors created an ambiguity by filing a Petition on the date that the TJP

7    Note was due, in the name of an entity that may or may not exist. It cannot disavow the

8    ambiguity it created by pretending that there is no significant legal distinction between a

9    trustee and a trust.

10            **iii.    BLPT's Other Arguments Support The Conclusion That There Is A**

11                    **Bona Fide Dispute**

12        BLPT's other argument in support of its claim is that "as a matter of law, and the

13    Purchase Agreement, preclude any purported set-off as a result of alleged activities of third

14    parties including Erik and Ryan." (Pretrial Statement ¶ 62.) BLPT's argument, as far as it can

15    be understood, simply highlights that all of the Petitioning Creditor's claims are related to each

16    other, and arise under the same nucleus of operative, disputed fact. *In re TPG Troy, LLC,* 492

17    B.R. 150, 160 (Bankr. S.D.N.Y. 2013) (dismissing petition where "plethora of ongoing

18    litigation that involves the same nucleus of facts speaks strongly to the likelihood that there is a

19    bona fide dispute…."). As a result, all of Petitioning Creditors' claims are the subject of bona

20    fide disputes and the Petition should be dismissed.

21        **D.    The REPS Line Of Credit Is Subject To Bona Fide Dispute.**

22        REPS asserts a claim for $1,450,000 for money loaned to KP3 (the "REPS Loan").

23    (Pretrial Statement ¶ 31.)  The REPS LOC claim is subject to bona fide dispute both as to the

24    existence and amount of the claim, and also as to its terms.

25            **i.    REPS Cannot Meet Its Prima Facie Burden On The REPS LOC**

26        In the first phase of the burden shifting analysis, REPS must make a prima facie case as

27    to the validity and amount of this debt.  REPS has failed to carry this burden. Under California

28    state law, the material terms of a loan include the identity of the lender and borrower, the

1    amount of the loan, and the terms for repayment. *Peterson Dev. Co. v. Torrey Pines Bank,* 233

2    Cal.App.3d 103, 115 (Cal 4th 1991) (granting summary judgment to lender on putative

3    borrower's claim that borrower reasonably relied on lender's oral commitment to loan funds,

4    as evidenced by a letter of commitment that omitted material terms).  It is axiomatic that an

5    agreement (whether or not in writing) that omits material terms is not binding on either party.

6    *Id.; Langley v. FDIC*, 484 U.S. 86, 91 (1987) ("Quite obviously, the parties' bargain cannot be

7    reflected without including the conditions upon their performance, one of the two principal

8    elements of which contracts are constructed . . . . [P]romises, which impose duties, and

9    conditions, which make duties conditional, are the main components of agreements.")(citing

10    Farnsworth, Contracts § 8.2, p. 537 (1982)).

11        REPS concedes that KP3's obligation to repay is not evidenced by a signed writing.

12    (Pretrial Statement ¶ 33.)   And, the material terms of KP3's repayment obligation, namely

13    interest rate and maturity date, are disputed.  Accordingly, REPS cannot meet its prima facie

14    burden of proving its claim, and, cannot act as a qualifying creditor in commencing this

15    proceeding.

16        "The absence of a written agreement is in and of itself grounds for finding the Proposed

17    Debtor's alleged liability is subject to substantial questions of fact." *In re Elverson*, 492 B.R.

18    831, 841 (Bankr. E.D. Pa. 2013) (citing *In re Express Car & Truck Rental, Inc.,* 440 B.R. 422,

19    434 (Bankr. E.D. Pa. 2010)). "[I]n the absence of a written agreement memorializing the terms

20    of the alleged agreement, there is no doubt that a substantial question exists regarding the bona

21    fide status of the petitioning creditor." *Id.* (summarizing *In re Express Car & Truck Rental,*

22    *Inc.*) (internal quotations omitted).  In *Elverson*, the petitioning creditor submitted a "memo", a

23    one line writing evidencing an obligation to repay $850,000 that had been loaned to the alleged

24    debtor. 492 B.R. at 837.  The court found the memo was sufficient to prove that money was

25    owed, but was not an enforceable contract because the essential terms of the loan agreement

26    were missing, namely, the interest rate, and the maturity date. In the absence of those terms, the

27    writing was insufficient to constitute a contract.  *Id.*  The court recognized that at a trial on the

28    merits, perhaps more evidence could be adduced as to the terms of the loan; but for purposes of

1    an involuntary proceeding, substantial issues precluded the finding that the debt was not

2    subject to bona fide dispute.  The same is true here, and REPS has not made a prima facie case

3    as to the existence—and specific terms—of the obligation on which its claim against KP3 is

4    based.

5               **ii.      There Are Bona Fide Disputes Regarding KP3's Obligations Under**

6                        **The REPS LOC, Including As To The Maturity Date.**

7               Even if REPS could meet its prima facie burden, KP3's obligations on the REPS Loan

8    are in bona fide dispute because there are genuine issues of material fact as to which writing

9    governs the parties' obligations.  Tom testified that the loan is governed by the terms set forth

10   in that certain "Short Term Line of Credit Optional Advance Promissory Note" (the "February

11   LOC").  If the February LOC governs, then the interest rate is 6%, and the term is from

12   February 1, 2017 through November 30, 2017 (Karr Declaration Ex. H (February LOC and

13   July LOC), at 1, § 3).  REPS acknowledges that the February LOC was unsigned, but argues

14   that it was ratified by the prior resolution of the Board of Directors in January 2017. (Pretrial

15   Statement ¶33.) REPS Loan was not paid on or before December 1, 2017, and accordingly,

16   REPS concluded that KP3 was in default. (*Id.*) REPS justifies the commencement of this

17   proceeding in part because of the purported default on the REPS Loan. (*See id.* at ¶¶86-88.)

18              KP3 contends that whatever the effect of the February LOC, it was modified or novated

19   in July 2017 as evidenced by the Renewal Short Term Line of Credit (Optional Advance

20   Promissory Note) dated July 10, 2017 (the "July LOC" and together with the February REPs

21   LOC, the "REPS LOC") between REPS and KP3.  Karr Declaration ¶17 and Ex. H at 5, § 11.

22   Under the July LOC, the interest rate is 8%, and the term is from July 10, 2017 through April

23   10, 2018. Ex. H at 4, §§ 3, 4. The July LOC by its own written terms superseded and replaced

24   the February LOC.  *Id.* at 5, § 11. Like the February LOC, the July LOC was never executed,

25   but unlike the February LOC, the July LOC was simultaneously unanimously ratified by a

26   resolution of the KP3's Board of Directors dated July 10, 2017, which resolution was executed

27   by both Erik and Ryan. Karr Declaration ¶ 17; Ryan Dep. Ex. P, at 1. Thus, even if the

28   February LOC evidenced the parties' agreement at a certain time, there was either a

1    modification or a novation in July. Thus, even if the February LOC evidenced the parties'

2    agreement at a certain time, there was either a modification or a novation in July. See Cal. Civ.

3    Code § 1531 ("Novation is made (1) by the substitution of a new obligation between the same

4    parties, with intent to extinguish the old obligation . . . .").

5         Further, the modification or novation of the February LOC was supported by

6    consideration paid from KP3 to REPS.  It is undisputed that on July 21, 2017, shortly after the

7    KP3 Board approved the July LOC, KP3 made a payment of ███████      toward the

8    outstanding principal and interest on the REPS LOC.  (Pretrial Statement ¶31; Trial Ex. O

9    (REPS LOC Payment Summary Created by Tom Pancheri).  It is also undisputed that KP3 was

10   under no legal obligation to make a principal payment at that time. ████████████

11   ████████████████████████████  KP3 contends that this payment was

12   made to REPS as consideration for REPS' agreement to enter into the superseding July LOC,

13   which both (1) increased the amount available under the REPS LOC, and (2) extended the

14   maturity date on the LOC.  (Karr Declaration ¶ 17). ████████████████

15   ██████████████████████████████████████████

16   ████████████████████████

17         Petitioning Creditors may argue that the dispute between the February LOC and July

18   LOC is not material, because whether or not the debt was mature does not impact whether

19   Petitioning Creditors have a claim for purposes of section 101(5) and 303(b) of the Bankruptcy

20   Code.  This argument misses the mark.  The REPS' LOC claim is in bona fide dispute because

21   REPS asserted that the claim had matured, when it had not, and that claim is a basis for this

22   proceeding. *See In re Fountainhead Global Trust,* No. 604-69908, 2005 Bankr. LEXIS 1423,

23   *9, 11-12 (Bankr. D. Oregon July 1, 2005) (holding that the dispute over whether a statute of

24   limitations was applicable to petitioning creditors claim was sufficient to constitute a bona fide

25   dispute for purposes of section 303(b) and observing that the issue was not whether petitioning

26   creditors' claim was precluded, but whether there was a bona fide dispute over whether

27   petitioning creditor's claim was precluded).   Moreover, while a default generally is not

28   required for a petitioning creditor to commence an involuntary bankruptcy, **if the REPS LOC**

1   **is not due until April 10, 2018, then it cannot factor into the generally not paying debts**

2   **analysis, which only looks at obligations that came due (*i.e.* matured) prior to the Petition**

3   **Date**.

4   REPS may argue that it has met its prima facie burden even if certain of the terms of

5   repayment are not determinable because it is undisputed that KP3 borrowed some money

6   (more than the statutory threshold) from REPS.  First, as set forth above, in the absence of an

7   agreement on material terms, there is no enforceable agreement (there may be an equitable

8   right to payment, but that would certainly implicate disputes of fact and law). Second, post-

9   BAPCPA courts reject the argument that just because some amount is due, there is no bona

10  fide dispute. "Petitioning Creditors bear the burden of establishing that there is no genuine

11  issue of material fact that bears upon the liability or amount of the claim, not merely asserting

12  that some amount of money (more than the threshold amount) is due to them as a whole." *C&C*

13  *Jewelry Mfg. v. Laxmi Jewel Inc. (In re C &C Jewelry Mfg.),* No. 08-1238, 2009 Bankr. LEXIS

14  4516, *30 (B.A.P. 9th  Cir. April 10, 2009) ("C&C") (reversing bankruptcy court's grant of

15  summary judgment to petitioning creditor on the basis that there was at least some amount due,

16  even if that amount could not be precisely ascertained); *Mont. Dep't of Revenue v. Blixseth*,

17  No. 2:13-1324-JAD, 2017 U.S. Dist. LEXIS 206513 (D. Nev. Dec. 15, 2017) (bankruptcy code

18  is unambiguous that dispute over amount of claim will disqualify creditor even if that creditor

19  has an otherwise valid debt in some amount).

20  Moreover, even if REPS could conjure an enforceable provable oral contract, KP3 has

21  defenses to performance based on Erik and Ryan's conduct which frustrated the purpose of the

22  loan which and constitutes a defense to repayment.  The parties agree that the REPS Loan was

23  advanced in connection with establishing KP3.  Trial Exhibit AM (REPS Rog. Response) at

24  No. 4 (REPS LOC and TJP Note were extended to KP3 "in connection with the formation of

25  the business in January 2017."). KP3 would have never borrowed funds from REPS if it had

26  known that Erik and Ryan would compete with KP3 within a few months of causing REPS to

27  lend money.  Erik and Ryan's conduct give rise to defenses to KP3's obligation to repay the

28  loan under state law, and a gives rise to a right of offset against REPS.

1    REPS cannot prove that the liability or amount of its line of credit claim is beyond bona

2    fide dispute, and this claim must be disqualified.

3         **E.**     **The REPS Purchase Agreement Is Subject To Bona Fide Dispute**

4         REPS asserts a claim for $2,139,529.72 pursuant to a ticket purchase agreement (the

5    "Purchase Agreement") by which KP3 agreed, in connection with establishing KP3, to

6    purchase an inventory of event tickets from REPS for a total sales price of $3,565,992.88.

7    (Pretrial Statement ¶ 39.) The Purchase Agreement was executed by Robert on behalf of KP3

8    and by Erik on behalf of REPS. (*Id.* at ¶40.) KP3 paid the first two installments set forth in

9    paragraph 3 of the Purchase Agreement, $1,426,354 million in the aggregate, but has not paid

10    the third installment, $2,139,529.72.  (*Id.*) The price at which KP3 purchased the Legacy

11    Inventory from REPS, as set forth in paragraph 3 of the Purchase Agreement, was derived by a

12    formula: cost plus a twenty percent premium.  (Trial Ex. 9 (Purchase Agreement) at ¶ 3.) ███

13    ████████████████████████████████████████████████████████████

14    ████████████████████████████████████████████████████████████

15    ███████████████████████████████████████

16         **i.**     **The Purchase Agreement Must Be Enforced In Arbitration, And Is**

17         **Not Properly Addressed In This Court**

18         As a threshold matter, REPS claim under the Ticket Purchase Agreement is in bona fide

19    dispute because REPS brought this dispute—which has not reduced the dispute to judgment--to

20    the bankruptcy court despite a mandatory venue in a different forum.  *In re Mt. Diaries, Inc.,*

21    372 B.R. 623, 634-36 (Bankr. S.D.N.Y. 2007).

22         The Purchase Agreement contains a "Binding Arbitration" provision stating that:

23    "In the event that a dispute arises between the parties concerning the enforcement or the

24    interpretation of any provisions of this Agreement, such dispute shall be submitted to

25    arbitration for resolution."  (Trial Ex. 9 (Purchase Agreement) at ¶ 21.1.)  The provision goes

26    on to state that "such arbitration shall be final and binding, and shall be conducted" with an

27    arbitrator from the American Arbitration Association.  (*Id.*)  The following paragraph of the

28    Purchase Agreement is titled "Mandatory Venue," and states that the "aforementioned choice

1  of venue is intended by the parties to be mandatory and not permissive in nature, ***thereby***

2  ***precluding the possibility of litigation between the parties with respect to or arising out of***

3  ***this Agreement in any jurisdiction other than that specified in this paragraph***." *Id.*

4        There can be no doubt that, given the broad scope of the Purchase Agreement's

5  mandatory arbitration provision, Petitioning Creditors were legally required to submit this

6  dispute to arbitration. *See, e.g., Simula, Inc. v. Autoliv, Inc*., 175 F.3d 716, 721 (9th Cir. 1999)

7  (where clause calls for arbitration of disputes "arising in connection with" the contract,

8  plaintiff's "factual allegations need only 'touch matters' covered by the contract containing the

9  arbitration clause and all doubts are to be resolved in favor of arbitrability.") (quoting

10  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 624 n.13 (1985)); *see also*

11  Cal. Code Civ. Proc. § 1281.2; *St. Agnes Med. Ctr. v. Pacificare of Cal.*, 31 Cal. 4th 1187,

12  1195 (2003) ("State law, like the FAA, reflects a strong policy favoring arbitration agreements

13  . . . .").

14        The arbitrability of REPS' claim under the Purchase Agreement is not even a close call:

15  this proceeding is an attempt by Petitioning Creditors to "enforce" the terms of the Purchase

16  Agreement, ████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████  REPS' claim under the Purchase Agreement falls squarely within that

20  agreement's binding arbitration provision, and should have been filed in that venue.

21  Petitioning Creditors' attempt to enforce the Purchase Agreement in bankruptcy requires a

22  finding that the claim is in bona fide dispute. *In re Mt. Dairies, Inc.,* 372 B.R. at 634.

23          **ii.**    **Petitioning Creditors Admit That The Amount They Seek Under the**

24               **REPS Purchase Agreement Is Disputed.**

25        The Purchase Agreement contains a rather unusual provision stating: "This

26  Agreement…may be amended and/or modified by an oral agreement between the parties…"

27  (Ex. 9 at ¶ 11.)  In addition to the approximately $2.1 million included in REPS' claim on the

28  Petition, REPS has asserted an additional amount of over $800,000 is due pursuant to an oral

1    amendment to the Purchase Agreement.



20        No doubt recognizing the threat this dispute poses to REPS' claim under the Purchase

21    Agreement, Petitioning Creditors now seek to obfuscate their claims and now argue that it was

22    Erik and Ryan individually—and not REPS—who were promised additional sums by KP3

23    based on a verbal modification to the Purchase Agreement.  Pretrial Statement ¶56.  But this

24    characterization of the supposed verbal agreement is flatly inconsistent with the evidence

25    adduced in this proceeding.  For example, an email produced by Erik in this proceeding

26    includes the following statement from Erik to Tom:  "***In addition, as we previously agreed,***

27    ***KP3 will pay REPS $853,000 for the excess profit from the sale of tickets purchased at the***

28    ***start of our venture***."  Trial Ex. DH (EP-00000961).  KP3 disputes that any amount is owed to

1   REPS on the basis of this alleged verbal agreement.  But for purposes of this proceeding, the

2   existence of this dispute is independently sufficient to establish that REPS' claim under the

3   Purchase Agreement is in bona fide dispute.

4         Bankruptcy Courts reject creditor attempts to pick an undisputed number, and obfuscate

5   the disputed portions. *See e.g. C&C Jewelry Mfg. v. Laxmi Jewel Inc. (In re C&C Jewelry*

6   *Mfg.*), 2009 Bankr. LEXIS 4516, *32 (expressly rejecting petitioning creditor's argument that

7   so long as some undisputed amount is due, that is sufficient to satisfy the bona fide dispute

8   requirement); *In re ELRS Loss Mitigation, LLC*, 325 B.R. 604, 628 (Bankr. N.D. Ok. 2005)

9   ("[T]he testimony of [petitioning creditor] is a model of obfuscation. He acknowledges the

10  existence of the equipment purchase agreement, admits executing the same, and then claims to

11  be owed amounts far in excess of the amounts set forth therein.").  The reasoning is clear. The

12  bona fide dispute requirement is intended to prevent creditors from commencing involuntary

13  petitions to coerce reluctant debtors to pay. Creditors who hold claims that are at least

14  somewhat undisputed may be the most inclined to commence an involuntary petition to coerce

15  a debtor to pay, rather than commence a lawsuit in some other, slower forum. ████████

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████ Rather than shielding debtors from vexatious creditors, allowing creditors

19  with partially disputed claims to sustain involuntary petitions turns the bankruptcy into the

20  court of first resort for claims resolution, surely not the intent of Congress. *In Re Fountainhead*

21  *Global Trust,* 2005 Bankr. LEXIS 1423, at * 10 ("[T]he exclusion of holders of disputed

22  claims from initiating involuntary cases is consistent with the overall structure of the

23  Bankruptcy Code. The primary function of the bankruptcy court is to oversee liquidation or

24  reorganization under Title 11; the adjudication of particular disputes is an adjunct, and not a

25  primary function.").

26        In *In re Mt. Dairies, Inc.*, 372 B.R. 623 (Bankr. S.D.N.Y. 2007), the bankruptcy court

27  dismissed the involuntary petition outright based on the attempt by the petitioner (Schneider-

28  Valley) to "subtract out" the disputed aspects of its claim and pursue the involuntary only on

1    the portion of the claim that was not subject to dispute. The Court rejected petitioning

2    creditor's argument that so long as the undisputed portion of its claim exceeded the statutory

3    threshold, there was no bona fide dispute:

> The crux of Schneider-Valley's argument its willingness to make post-petition corrections to its initial claim to prove that, although hundreds of thousands of dollars may be in dispute, at least some amount (though ultimately no definitive amount) above the [threshold] in 11 U.S.C. § 303(b) must not be in dispute. These concessions do not, as Schneider-Valley contends, eliminate the bona fide dispute. Rather, they raise serious concerns over the legitimacy of Schneider-Valley's entire claim. That a claim could have been filed in good faith when a substantial portion of that claim was the subject of a dispute on its face is untenable.
>
> Finding in Schneider-Valley's favor would encourage plaintiffs in two-party disputes to flock to bankruptcy court in the hopes of a brisk resolution of those disputes. At the very least, it would legitimatize the threat of an involuntary petition and provide plaintiffs with a powerful advantage. Defendants in two-party disputes would be placed at a significant disadvantage if, facing the stigma of bankruptcy, they were compelled to settled on unfavorable terms. This Court is not prepared to endorse a policy that would so disrupt the very fabric of our judicial system.

372 B.R. at 634 (internal citations omitted).   Petitioning Creditors' attempt to bring this involuntary petition only as to certain elements of the parties' dispute under the Purchase Agreement, while saving other elements of the dispute for another day, is a similarly "untenable" misuse of the bankruptcy system, and their claim under that agreement must be rejected.[11]

---

[11]   Besides disputing that the Purchase Agreement can be enforced against it, KP3 also disputes the amount owed. A number of the tickets that KP3 acquired from REPS pursuant to the Ticket Purchase Agreement related to events that were later cancelled. The face value of the tickets for those cancelled events was refunded to REPS, and not to KP3. (Karr Decl. ¶ 38.) The face value of tickets that were transferred to KP3 under the Ticket Purchase Agreement but later cancelled is $196,923.25. (Id.) Factoring in the 20% premium that KP3 paid to REPS for these tickets, the amount is $236,307.90, and REPS has not reimbursed this amount to KP3. (Id.)

      **iii.**    **The REPS Purchase Agreement Is An "Interested Transaction," And REPS Bears The Burden To Prove The Agreement Is Not "Void or Voidable"**

Even as to Petitioning Creditors' claim under the written terms of the Purchase Agreement, significant disputes preclude a finding that the claim is not in bona fide dispute, as described in the following sections.

When the Purchase Agreement was authorized by KP3's Board of Directors, Erik and Ryan had an "interest" in the transaction given their roles as Directors of *both* REPS and KP3.[12]  RJN as Ex. AS (REPS Feb. 6, 2018 Sec. of State Filing) and (Ryan Dep. Ex. N. January 17, 2017 KP3 Board Action at § 3.  (Under California Corporations Code Section 310, an interested transaction is void or voidable unless one of the following criteria is satisfied:

(1) The material facts as to the transaction and as to such director's interest are fully disclosed or known to the shareholders and such contract or transaction is approved by the shareholders in good faith, *with the shares owned by the interested director or directors not being entitled to vote thereon*, or

(2) The material facts as to the transaction and as to such director's interest are fully disclosed or known to the board or committee, and the board or committee authorizes, approves or ratifies the contract or transaction in good faith *by a vote sufficient without counting the vote of the interested director or directors* and the contract or transaction is just and reasonable as to the corporation at the time it is authorized, approved, or ratified, or

(3) As to contracts or transactions not approved as provided in paragraph (1) or (2) of this subdivision, *the person asserting the validity of the contract or transaction sustains the burden of proving that the contract or transaction was just and reasonable as to the corporation at the time it was authorized, approved or ratified*.

(Cal. Corp. Code § 310(a)(1)-(3) (italics added).  California courts describe the operation of section 310(a) as follows: "Where a *dis*interested majority approves the transactions and there was full disclosure, section 310(a)(2) applies, and the burden of proof is on the person

---

[12] Calif. Corporations Code Section 310(a) defines an interested transaction as a "contract or other transaction between a corporation and one or more of its directors, or between a corporation and any corporation, firm or association in which one or more of its directors has a material financial interest."  Cal. Corp. Code § 310(a).   "Section 310 does not, however, require an expectation of pecuniary gain from the transaction itself."  *Wolkowitz v. Lerner* (*In re Imperial Credit Indus.*), No. SA CV 07-777CAS, 2008 U.S. Dist. LEXIS 71984 *16-17 n.5 (C.D. Cal. Sep. 18, 2008).

1  challenging the transaction. Where, however, the approval was not obtained from a

2  disinterested board vote, section 310(a)(3) applies and requires the person seeking to uphold

3  the transaction to prove it was "just and reasonable" to the corporation." *Sammis v. Stafford*,

4  48 Cal. App. 4th 1935, 1943 (1996) (internal citations omitted).

5        Because Erik and Ryan voted to authorize the transaction, REPS cannot avail itself of

6  section 310(a)(1) to validate the transaction.  Section 310(a)(2) is also not available to REPS,

7  because Erik and Ryan were two of KP3's four Directors at the time, and thus the vote could

8  not have been approved by a majority of the KP3 Board without counting Erik's and Ryan's

9  votes.  Ryan Dep. Ex. N. (January 17, 2017 KP3 Board Action) at § 3.  Accordingly, pursuant

10  to Corporations Code Section 310(a)(iii), the validity of the Purchase Agreement is dependent

11  on REPS' "proving that the contract or transaction was just and reasonable as to the

12  corporation at the time it was authorized, approved or ratified."  Any attempt by REPS to

13  enforce the Purchase Agreement against KP3 will thus require REPS to prove that the contract

14  was "just and reasonable" as to KP3 and should not be deemed void as an interested

15  transaction.

16        Petitioning Creditors have not offered evidence that the terms of the Purchase

17  Agreement are just and reasonable, and accordingly, the terms of the Purchase Agreement are

18  in bona fide dispute.

19        **iv.    KP3's Frustration of Purpose Defense To Enforcement Of The**

20               **Purchase Agreement**

21        REPS' claim for payment under the Purchase Agreement is subject to the defense of

22  frustration of purpose.  "Where, after a contract is made, a party's principal purpose is

23  substantially frustrated without his fault by the occurrence of an event the non-occurrence of

24  which was a basic assumption on which the contract was made, his remaining duties to render

25  performance are discharged, unless the language or circumstances [of the contract] indicate the

26  contrary."  REST. OF CONTRACTS, 2ND, Section 265; *see also Federal Leasing Consultants, Inc.*

27  *v. Mitchell Lipsett Co*., 85 Cal. App. 3d Supp. 44, 47-49 (1978) (upholding trial court decision

28  that frustration of purpose defense excused party's performance under commercial agreement).

1   The purpose of the Purchase Agreement was to free up Erik's and Ryan's time to enable them

2   to exclusively devote their skills and effort to KP3.  Erik and Ryan's bad acts were committed

3   after KP3 and REPS executed the Purchase Agreement, and constituted an intervening event

4   that frustrated KP3's purpose for entering into the agreement.

5               **a.      The Purpose Of The REPS Purchase Agreement Was For**

6                         **Erik And Ryan To Focus Their Efforts On KP3's Business.**

7               At his deposition, Ryan confirmed that the purpose of the Purchase Agreement was to

8   permit Erik and Ryan to focus their time and energy on KP3's business.  In connection with

9   establishing KP3, Erik and Ryan executed Employment Agreements pursuant to which they

10  agreed that they would be employed by KP3 on a full time and exclusive basis to render and

11  perform ticket purchase, marketing, pricing, and sales services, and related services for KP3.

12  Karr Declaration Exs. BN, BO.  (Employment Agreements at §§ 2.1-2.2) ("The EMPLOYEE

13  shall devote the EMPLOYEE's full time, attention and effort to the performance of the

14  EMPLOYEE's duties hereunder," and "The EMPLOYEE shall render Ticket Marketing

15  Services exclusively for and on behalf of the EMPLOYER at all times during the terms of this

16  Agreement.")  Because Erik and Ryan still possessed a multi-million dollar ticket inventory in

17  REPS (the "Legacy Inventory") when KP3 was formed, their Employment Agreements with

18  KP3 contained an exception to the exclusivity clause permitting Erik and Ryan to market and

19  sell the tickets from the Legacy Inventory, and retain the proceeds for REPS.  *Id.* at § 2.2.2.)

20

21

22

23

24

25

26

27

28



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20



21                               Ryan was an officer and director of REPS when the

22 Purchase Agreement was executed (Karr Declaration ¶¶7, 37), and his testimony confirms that

23 all parties to that agreement understood that its primary purpose was to permit Erik and Ryan

24 to focus their full time and efforts on the business of KP3.

25

26

27

28

**b.      Erik And Ryan's Bad Acts Frustrated The Purpose Of The**

**REPS Purchase Agreement.**

Erik and Ryan's bad acts frustrated the purpose of the Purchase Agreement, which—as Ryan has testified—was to permit Erik and Ryan to devote their full time and efforts to KP3. As described in the Statement of Facts, Erik and Ryan did not devote their "full time, attention and effort" to KP3, but were actively competing against KP3 and dedicating their time and efforts to their competing company. (*See id.*) Erik and Ryan then used KP3's own employees and independent contractors (all of whom were on KP3's payroll) to build their competing business, and in the process they aided and abetted these individuals' violations of their own obligations to KP3.

In addition to generally failing to devote their full time and effort to KP3's business, Erik and Ryan's bad acts further frustrated the purpose of the Purchase Agreement because they specifically failed to devote their full time and attention to the resale of the ticket inventory that KP3 had agreed to purchase from REPS. This is confirmed by the evidence that—in order to free up themselves and other KP3 employees to work on their competing endeavor—Erik and Ryan knowingly outsourced KP3's concert ticket resale function to a third-party vendor they knew to be inferior to KP3's own staff. ███████████ ███████████████████████████████████████████ *Importantly, under the frustration of purpose doctrine it is not necessary that KP3 prove REPS' culpability for the bad acts of Erik and Ryan.* Indeed, most cases in which the "frustration of purpose" defense is successfully asserted do not involve any wrongdoing by a party to the agreement; it is the unanticipated intervening event that relieves further performance, even if the other party to the contract has done nothing improper. RESTATEMENT OF CONTRACTS, 2ND, Sec. 265, illustrations to comment a. KP3 need only show that (1) Erik and Ryan's bad acts were not anticipated by the parties, and (2) Erik and Ryan's bad acts have frustrated KP3's primary purpose under the Purchase Agreement which, according to Ryan Pancheri, was to "free up" Erik and Ryan to devote their best efforts to KP3. See RESTATEMENT OF CONTRACTS, 2ND, Sec. 265. KP3 can establish both of these elements, and the frustration of

1  purpose will operate as a powerful defense to KP3's performance under the Purchase

2  Agreement. The frustration of purpose defense confirms the existence of a bona fide dispute as

3  to REPS' claim under the Purchase Agreement.[13]

4  **VII.    CONCLUSION AND RESERVATION OF RIGHTS**

5       First, Petitioning Creditors cannot show that KP3 is a company that is generally not

6  paying its debts as they come due, and the Petition must be dismissed. Second, the Petition

7  must be dismissed because it was filed by the Pancheri Creditors in bad faith, and joined in by

8  SDCC in bad faith. Third, the Petitioning Creditors cannot show that their claims are not

9  subject to bona dispute as to liability and amount and they have acknowledged that KP3 has

10 significantly more than 12 eligible creditors – therefore, the Petition must be dismissed.

11      If the Court dismisses the Petition under Bankruptcy Code Section 303(b), 303(h) or

12 305, or otherwise, KP3 reserves the right to file a motion and develop the record for relief

13 under Section 303(i) of the Bankruptcy Code, and respectfully requests that the Court reserve

14 jurisdiction to consider such motion.

15 **VIII.   LOG OF EXHIBITS**

16      The Parties' Exhibit list is filed contemporaneously herewith.

17                              Respectfully submitted,
18 Dated:  April 3, 2018        STRADLING YOCCA CARLSON & RAUTH, P.C.

19

20                         By: /s/ Fred Neufeld
                              Fred Neufeld
21                            Marianne Mortimer
                              Tatiana Ingman
22                            Counsel for KP3 Endeavors, Inc.

23

24 [13] Notably, Restatement Second of Contracts § 272 says that where the "frustration of purpose"
   doctrine relieves a party of its duty to perform, restitution may still be available to allow some
25 recovery based on any actual benefits conferred under the agreement.  Here, the amount of
   restitution KP3 owes to REPS for benefits conferred under the Purchase Agreement—if any—
26 would be subject to evidence to be developed in the AAA arbitration proceeding.  This is just
   further confirmation that bona fide disputes exist both as to the existence and amount of REPS'
27 alleged claim against KP3 under the Purchase Agreement.  *See Laxmi Jewel Inc. v. C&C*
   *Jewelry Mfg., Inc. (In Re C&C Jewelry Mfg, Inc.)*, 2009 Bankr. LEXIS 4517 (B.A.P. 9th Cir.
28 April 14, 2009); *Mont. Dep't of Revenue v. Blixseth*, No. 2:13-1324-JAD, 2017 U.S. Dist.
   LEXIS 206513 (D. Nev. Dec. 15, 2017).

# PROOF OF SERVICE

I am a resident of the State of California, over the age of 18 and not a party to this action.

On April 3, 2018, I served the following documents:

**KP3 ENDEAVORS, INC.'S BRIEF IN SUPPORT OF DISMISSAL OF THE INVOLUNTARY CHAPTER 7 PETITION**

1. **To Be Served by the Court Via Notice Of Electronic Filing ("NEF"):**
   Under controlling Local Bankruptcy Rule(s) ("LBR"), the document(s) listed above will be served by the court via NEF and hyperlink to the document. On <u>April 3, 2018</u>, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

   Thomas B. Gorrill on behalf of Petitioning Creditor Bonnie L. Pancheri Trust
   tgorrill@gorillalaw.com, r53431@notify.bestcase.com

   Thomas B. Gorrill on behalf of Petitioning Creditor REPS Investments, Inc.
   tgorrill@gorillalaw.com, r53431@notify.bestcase.com

   Thomas B. Gorrill on behalf of Petitioning Creditor San Diego Computer Consulting
   tgorrill@gorillalaw.com, r53431@notify.bestcase.com

   Fred Neufeld on behalf of Alleged Debtor KP3 Endeavors, Inc.
   fneufeld@sycr.com, tingman@sycr.com

2. **Served by United States. Mail Or Overnight Mail:**
   On <u>April 3, 2018</u>**,** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed enveloped in the Unites States Mail via 1) first class, postage prepaid, 2) certified mail with receipt number or 3) overnight mail service addressed as follows:

3. **Served by Personal Delivery, Facsimile Transmission or E-Mail:**
   Under F.R.Civ.P. 5 and controlling LBR, on <u>April 3, 2018</u>, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or e-mail as follows:

   I declare under penalty of perjury under the laws of the United States of America that the statements made in the proof of service are true and correct.

Executed on <u>April 3, 2018</u>

*/s/ Christine Pesis*
Christine Pesis

100 Wilshire Blvd., 4th Floor
Santa Monica, Ca 90401